785 A.2d 826

Tony RATCHFORD,

v.

STATE of Maryland.

No. 2055, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Nov. 29, 2001.

Michael R. Malloy, Assistant Public Defender (Stephen E. Harris, Public Defender on the brief,) Baltimore, for Appellant.

Diane E. Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General and Patricia Jessamy, State's Attorney for Baltimore City on the brief,) Baltimore, for Appellee.

Argued before MURPHY, C.J., and CHARLES E. MOYLAN, JR. (retired, specially assigned), and RAYMOND G. THIEME, JR. (retired, specially assigned), JJ.

MOYLAN, J.

The appellant, Tony Ratchford, was convicted by a Baltimore City jury, presided over by Judge William D. Quarles, of two counts of first degree murder, one count of second degree murder, and other related charges. On this appeal, he claims

1. that he was denied his Sixth Amendment constitutional right to a speedy trial;

2. that Judge Quarles erroneously admitted his confession, the taking of which did not comply with the requirements of *Miranda v. Arizona;*

3. that his efforts at the suppression hearing to cross-examine the interviewing detective about precise questions asked in the course of the interview were erroneously curtailed and that, at trial, his request for a *de novo* suppression hearing outside the presence of the judge was erroneously denied; and

4. that the State was erroneously allowed to give an improper rebuttal argument to the jury.

### Speedy Trial

This is not a *Hicks* claim. It is exclusively a constitutional speedy trial argument pursuant to the Sixth Amendment of the United States Constitution. We shall review it under the four-factored analysis of *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

The crimes in this case were committed on September 27, 1997. The appellant, while in jail on an unrelated matter, was arrested for the crimes in this case on October 25, 1997, and that, for constitutional speedy trial purposes, is the date on which the clock begins to run. His first trial began on May 5, 1999, eighteen months and two weeks later. It was on that day that the speedy trial motion now under review was argued before Judge John C. Themelis and was denied. Our concern,

therefore, is with the period from October 25, 1997 to May 5, 1999.

## A. The Trigger of "Constitutional Dimensions":

■ The "length of delay" between arrest and trial is a term of art that serves two separate and distinct functions in a speedy trial analysis. In its first function, it identifies the threshold that must be crossed before any further analysis is called for. Along the delay continuum, the trigger of "constitutional dimensions" is not itself part of the ultimate merits of a speedy trial claim. It simply marks the minimal point, short of which a court will dismiss a claim summarily and will not waste its time even inquiring into such things as reason for delay, demand-waiver, or prejudice. Beyond that minimal or triggering point, however, the claim may not necessarily have merit, but it is worthy at least of thoughtful consideration. The trigger of "constitutional dimensions" is exclusively a procedural phenomenon that justifies a further analysis and then drops out of the picture.

The defense bar, however, has a chronic tendency to conflate the two functions of "length of delay" and to transform the mere procedural catalyst into a judicial pronouncement on the merits that takes on an apparent gravity that was never intended. The phrase "constitutional dimensions" does, indeed, pack a potent rhetorical punch. Defense attorneys, therefore, frequently treat the preliminary finding that a delay is of "constitutional dimensions" as persuasive argument that there was a violation of the right to a speedy trial itself.

■ It is, of course, no such thing. Even a long delay caused exclusively by the defendant, for instance, would easily satisfy the procedural requirement of being of "constitutional dimensions" but as a factor on the ultimate merits would be entitled to no weight whatsoever. The "length of delay," as one of four interrelated factors in a *Barker v. Wingo* analysis, may be a factor of great weight, may be of intermediate weight, or may be of slight weight. In an apparent paradox, even a delay of very slight weight would necessarily have been

of "constitutional dimensions" or the very weighing process, as part of the ultimate analysis, would never have taken place. Once the Sixth Amendment merits are in play, the only response that need be made to the no longer necessary use of the phrase "constitutional dimensions" is, "Of course, it's of 'constitutional dimensions' or we wouldn't even be having this hearing."

■ Our point is that the notion of a delay being of "constitutional dimensions" concerns only the threshold issue of whether a *Barker v. Wingo* analysis shall even be undertaken. Once the decision has been made to engage in that analysis, the threshold procedural finding no longer has any pertinence. The phrase "constitutional dimensions" needs no further mention.

■ The length of delay of eighteen months in this case was of constitutional dimensions and the speedy trial claim, therefore, was and is deserving of further analysis. The concept of "constitutional dimensions," having fully served its purpose, will have nothing to do with that further analysis.

## B. The Length of Delay:

■ Once we are engaged in *Barker v. Wingo* 's four-factored analysis, we view the "length of delay" in a different light. As far as the length of delay itself is concerned, what was sufficient to enable it to serve its first and triggering function may be of only minimal significance when it comes to its second function. Depending on which of its two functions is being served, we treat the "length of delay" very differently. As one of the four factors on the ultimate merits, it is heavily influenced by the other three factors, particularly that of "reasons for the delay." It may gain weight or it may lose weight because of circumstances that have nothing to do with the mere ticking of the clock. When serving its procedural or triggering function, however, the "length of delay"is impervious to such influences and circumstances. It is a mathematical constant that only requires us to read the calendar.

■ "Length of delay" in one of its manifestations, more-over, is by no means the equivalent of "length of delay" in its other manifestation. For its procedural function, "length of delay" is the gross period of time between the arrest and the trial or the hearing on the motion. For its function as a factor on the merits, by contrast, the "length of delay" is the net period of time that may be chargeable to the State or to the court system as true "delay," some of which, depending on other circumstances, may be given great weight and some of which may be given only slight weight.

The length of delay of eighteen months in this case, al-though it was more than enough to spark further analysis, is not on the ultimate merits particularly remarkable. In *Barker v. Wingo* itself, for instance, a length of delay of five years was held not to have violated the Sixth Amendment. An eighteen month delay is not, on the one hand, so brief as to call for summary dismissal and to obviate the need for further scrutiny. Neither, on the other hand, is it so overwhelming, as for example a ten year delay might be, as potentially to override the consideration of all other factors. In and of itself, it is not a weighty factor, one way or the other.

### C. Demand–Waiver:

For organizational convenience, we choose to consider the remaining factors out of their usual order. As with the length of delay, the demand-waiver factor is of little help to either party in this case. The appellant never waived his right to a speedy trial. Nor did he, except for an early on and *pro forma* objection to a postponement on a single occasion, ever consistently and vigorously cry out for the speedy disposition of the charges against him. This potential factor is a non-factor in this case.

### D. Prejudice:

Prejudice is not a weighty factor in this case. Presumed prejudice simply enjoys a weight proportionate to the length of delay itself, a factor that we have observed as being in this case very marginal.

In terms of actual prejudice, the appellant was subjected to pretrial incarceration. By the same token, the appellant was facing three separate charges of murder in the first degree and he ultimately was sentenced to two consecutive terms of life imprisonment without parole, compounded by another consecutive term of thirty years imprisonment. We also note that when the appellant was arrested on October 25, 1997, he was in jail on another unrelated matter. In his brief, the appellant has not bothered to tell us whether all or part of his pretrial incarceration overlapped detention for some other reason. In terms of this variety of actual prejudice, the appellant does not make much of a case. In terms of showing actual prejudice, moreover, the burden is on the defendant.

The most significant variety of actual prejudice is prejudice to the defense of the case. The appellant does not suggest any such prejudice. The appellant did not take the stand in his own defense nor did he call any defense witnesses. There is no suggestion of any lost witnesses or of how their presence might have helped the defense case. There is no suggestion of any failed memory or of how a fresher recollection would have helped the defense case. There was no prejudice to the defense of the case.

### E.   Reason for Delay:

Eighteen months, to be sure, was a long time in scheduling this case for the trial table for the first time. Much of that delay, however, was attributable, in whole or in part, to the defense itself. Following the arrest of the appellant on October 25, 1997, the case was first scheduled for trial on May 5, 1998. That period of time was necessary for the orderly administration of justice and is not considered an unreasonable delay that calls for further accounting. *Howell v. State,* 87 Md.App. 57, 82, 589 A.2d 90 (1991).

That conclusion is well supported by the fact that appellant's first defense attorney did not enter his initial appearance until January 14, 1998. This was, moreover, an extremely complex case, involving three separate murders charged

against multiple co-defendants. It involved numerous witnesses and considerable forensic evidence, including two forms of DNA testing.

On May 5, the trial was postponed until May 27 because the prosecutor was tied up in another protracted case. That three-week delay was attributable to the State.

The second postponement, from May 27 to July 14, is something of which the appellant may not complain because he requested it. The fact that the State also wished the postponement is coincidental. Defense counsel represented to the court that he wanted a postponement "until July for further trial preparation."

The third postponement, from July 14 until September 8, became inevitable when the appellant's first defense attorney withdrew from the case because of a conflict of interest and his second defense attorney only entered his appearance in June. July 14 had been scheduled for a hearing on motions and the new defense attorney indicated that he did not intend to pursue those motions. By mutual agreement, the case was sent to the administrative judge for a postponement "into September or November."

It was scheduled for September 8. On that day the case was postponed a fourth time, until October 14, because counsel for both the appellant and his codefendant "wanted time to investigate new witnesses."

The fifth postponement, from October 14 until January 19, 1999, was not the appellant's fault. Neither, however, was it the State's fault. The judge to whom the case was then assigned had a very truncated trial schedule and all indications were that the case against the two codefendants would take between two and one-half and three weeks with "some fifty witnesses at least noted on the State's side." The scheduled court was unavailable for a trial of that length.

The sixth postponement, from January 19 to March 9, became inevitable when the appellant's second defense attorney withdrew from the case and his third lawyer entered her

appearance on December 28, 1998. The new attorney was, moreover, in trial in another court in another case.

The seventh and final postponement, from March 9 to May 5, was one where new defense counsel indicated that she needed more time to prepare the case. The fact that the prosecutor was in trial in another case was again coincidental.

Basically, probably because of having had three different lawyers, we have a defendant who was not ready to go to trial on those serious charges. It is not a case in which a defendant, ready and eager to resolve the charges against him, was unconstitutionally denied his right to a speedy trial. We affirm Judge Themelis's denial of the speedy trial motion.

### A Reluctant Analysis

The appellant's second and third contentions both challenge, in different ways, the admission into evidence of a statement he gave to Detective Darryl Massey on September 30, 1997, three days after the crimes were committed. Our chagrin at having to get embroiled in the contentions is because the impact of the statement on the appellant's case was so marginal as to be virtually nugatory. We are being asked to make a mountain out of a molehill.

When Detective Massey interviewed the appellant on September 30 (he was not arrested for these crimes until a month later), the detective noticed that the appellant had scratches just above his left eye and on his neck. These could have had significance because there was evidence that there had been a struggle at the scene of the murders. The appellant's explanation for the scratches was that he had been involved in a fight with someone named Rodney. That "fight" did, to be sure, place him within two blocks of the murder scene. On the other hand, it was a crowded neighborhood that the appellant regularly frequented. The total impact of the statement was in the following exchange.

Q   And did you specifically ask him about the injuries to his neck and his left forehead?

A   Yes, I did.

. . . .

Q  What if anything did he say about the injuries and his left forehead?

A  He told me that he sustained those injuries in a fight with a gentleman by the name of Rodney on Friday the 26th of September, 1997.

Q  And where did he say the fight with Rodney on Friday, September 26th, 1997 occurred?

A  In the alley, Park Heights and Cold Spring, West Cold Spring.

Q  And how far is the alley located at Park Heights and West Cold Spring Lane from our crime scene?

A  Cold Spring separates, the intersection of 4400 block of Park Heights Avenue.

Q  So he put himself two blocks away on the night of the murder in a fight from our crime scene; is that correct?

A  Yes. Yes, ma'am.

Later in his testimony, Detective Massey summed up the appellant's statement as far as any acknowledgment of his involvement in the crimes was concerned:

Q  And you advised him again that he was a suspect in a triple homicide?

A  That's correct.

Q  And what did he say this time?

A  *He said that he didn't know what I was talking about. He said, I didn't do anything; I don't know what you're talking about; I didn't do anything.*

(Emphasis supplied).

Fundamentally, that is exculpatory. The inculpatory significance of the statement is so slight, if anything at all, that it is hard to get excited about it. Because the State offered it, however, and it was received, it behooves us to treat the two contentions as if they had significance. What is nonetheless clear from this discussion is that, if our decision on either the second or third contention were to be different, we would not hesitate to find harmless error.

## The Voluntariness of the *Miranda* Waiver

The appellant's second contention is that he did not voluntarily waive his *Miranda*-based right to silence and right to counsel. The appellant is swimming upstream against a strong current on this issue, in that he never took the stand at the May 22, 2000 suppression hearing before Judge Quarles immediately before the commencement of the trial. The only witness at the hearing was Detective Massey, a witness whom Judge Quarles found to be credible.

Detective Massey testified that he slowly and carefully delivered to the appellant the full *Miranda* catechism. The appellant replied that he understood each and every sentence of the *Miranda* litany. The appellant freely waived both of the so-called *Miranda* rights. Following Detective Massey's testimony and argument by counsel, Judge Quarles expressly found:

> In this case I do find, having heard the detective and heard the uncontradicted testimony that has been proffered, that the Defendant was given his Miranda rights, that he was interviewed under conditions of relative comfort, in that bathroom breaks and other personal needs were attended to and that he was given Miranda warnings and had indicated to the detective an understanding of those warnings.

Based on those findings, Judge Quarles ruled:

> Accordingly, I do find that the statement was voluntarily made and that there was no offense to Miranda or any other requirement.

The appellant argues that the waiver of rights was, as a matter of law, invalid because Detective Massey did not advise the appellant, prior to obtaining the *Miranda* waiver, that the subject of the interrogation was to be a triple murder. The law, however, does not compel such an advisement. In *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), the petitioner made the same argument that the appellant advances here. In rejecting it, the Supreme Court held:

[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. Here, the additional information could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature. Accordingly, *the failure of the law enforcement officials to inform Spring of the subject matter of the interrogation could not affect Spring's decision to waive his Fifth Amendment privilege in a constitutionally significant manner.*

479 U.S. at 576–77, 107 S.Ct. 851, 859 (emphasis supplied).

In *Alston v. State,* 89 Md.App. 178, 184–85, 597 A.2d 1023 (1991), this Court applied *Colorado v. Spring,* in rejecting a similar contention.

In view of the Supreme Court's holding, the question *whether the appellant knew of all of the subjects about which he was to be questioned is irrelevant to the question of whether his Miranda waiver was made knowingly, intelligently, and voluntarily.* Since the appellant does not suggest that his *Miranda* waivers were involuntary for any other reason, we find that the lower court properly denied his Motion to Suppress.

(Emphasis supplied).

### Restriction on Cross–Examination
### At Suppression Hearing

The police interview of the appellant on September 30, 1997, including the advisement as to *Miranda* rights, took less than thirty minutes. Detective Massey took notes, later memorialized the appellant's statement in a brief typed summary of it, and then destroyed his notes. The pretrial suppression hearing of May 22, 2000, took place twenty months later.

When defense counsel probed Detective Massey as to what precise questions he had asked in the course of the interview, Judge Quarles sustained the State's objection. In the colloquy that followed, two themes were intertwined. The dominant theme concerned the substantive content of the appellant's

statement and Judge Quarles's ruling seems clearly to have focused on that theme. The appellant's more fully articulated argument on that issue was that the questions were necessary to establish a context for the answers and that the answers might lack relevance without them. The State's objection, also looking at substantive content, was based on the fact that the exclusive focus of a suppression hearing should be on the threshold question of admissibility in terms of voluntariness and that any question about the substantive content of the statement, including its ultimate relevance or irrelevance, might be appropriate subject matter for the later trial but not for a suppression hearing. Judge Quarles's ruling also clearly focused on that issue, as he admonished defense counsel, "It's not discovery. We're past discovery." The implicit thrust of his ruling was that the hearing had exhausted its examination of the voluntariness issue and was not going to get embroiled in anything that had to do with the substance of the statement.

Momentarily complicating our analysis, however, is the fact that defense counsel repeatedly, albeit *sotto voce*, interwove a secondary theme into his brief argument. He also suggested that the forms of the questions themselves might somehow impact on the voluntariness of the answers, although he did not articulate quite how that might occur.

In retrospect, it might have been tactically wiser to have allowed the detective to have answered the questions. Detective Massey would probably have replied that he could not remember and that would have been the end of it. There could have been no claim that the Bill of Rights was in jeopardy. That, however, was the road not taken. For the moment, the contention is still before us.

The contention's suggestion is that some particular question, now lost to history, might have been so diabolically ingenious in form or content, that it, *ipso facto*, shattered the appellant's resolve to remain silent. The appellant's problem is that there no longer remained any such resolve capable of being shattered. The appellant had already waived his rights

to silence and to counsel. He had already decided to talk and was, indeed, in the very act of talking. The appellant does not suggest how any question, no matter how cleverly contrived, could date back so as to corrode retroactively a waiver decision that had already been made before the question was ever asked. The appellant's claim seems to be: "If I had not already waived my right to silence, the questioning I had agreed to would have been enough to cause me to waive it involuntarily." The answer to the claim is that the State, already engaged in questioning pursuant to a valid waiver, does not need a double waiver to continue the questioning.

Absolutely foreclosing on this issue was the failure of the appellant to proffer just what such a will-destroying question might have been. If some question had been so artfully configured that it either broke the appellant's initial will to resist or suppressed the possible reemergence of a will to resist, the appellant, as its victim, would have been far better positioned than anyone else to tell us what it was. Future handbooks on interrogation techniques would doubtlessly salivate for such an illustration. The appellant, however, never took the stand to enlighten us. He never, through counsel, even vicariously proffered what such a mind-altering question had been. He simply invites us, beyond the reach of our imagination, to speculate about abstract possibilities. Indeed, the essentially self-serving nature of the brief statement he actually did give belies any thought that his resolve to keep weaving and dodging was ever compromised in the slightest. We see no merit in the contention.

Turning to the related sub-contention, for all of the aforesaid reasons there was no reason why the appellant should have been permitted, on May 30, to relitigate, outside the presence of the jury, the admissibility question that had already been litigated on May 22. In terms of what defense counsel was permitted to ask on his cross-examination of Detective Massey in the presence of the jury, no limitation of any sort was ever imposed.

### The Open Door Policy For Responsive Argument

In his final contention, the appellant takes umbrage at comments made by the assistant state's attorney in her final rebuttal argument to the jury. The remarks complained of, with attendant objections, were as follows:

[PROSECUTOR]: Thank you, Your Honor. Ms. Cohen thinks that I want you to convict an innocent person. Ladies and gentlemen on the jury, the last thing I want you to do is to convict an innocent person. My job is not to ask you to convict innocent people. I don't sleep well at night doing this job for sixteen, almost seventeen years because—

[DEFENSE ATTORNEY]: Objection.

THE COURT: Overruled.

[PROSECUTOR]:—I want to convict the innocent. I don't work for the City of Baltimore to convict innocent people.

[DEFENSE ATTORNEY]: Objection.

THE COURT: Overruled.

[PROSECUTOR]: Detective Massey is not the outstanding homicide detective he is because he wants to convict innocent people. We are here to do our jobs. And the day I sentence [an innocent] person to a conviction is the day I quit. So I'm sorry, but I have to start (unclear) ...

[DEFENSE ATTORNEY]: Objection, move to strike, Your Honor.

THE COURT: Okay, Overruled.

[PROSECUTOR]: My job is to represent the people of Baltimore City in this murder case who ask you to do one thing—be fair and do justice....

In a vacuum, the appellant's umbrage would be well taken. The assistant state's attorney unquestionably injected herself—her integrity, her honor—into the case. With the Churchillian repetition of the critical phrase, moreover, she did so very effectively. Ordinarily, she should have remained a neutral and unengaged commentator, an interpreter of the trial proceedings without subjective involvement in them.

In larger context, however, it is clear that the assistant state's attorney did not inject her character and her motivation into the argument. It was the defense attorney who did that. It was she who, in closing argument, cast dire aspersions on the prosecutor's professional integrity as she used an *ad hominem* attack on the assistant state's attorney to drag a red herring across the trail the jury should have been following:

> *So what do you if you're a prosecutor, you're the State, and you, and you have no evidence but you've got a terrible crime. What do you do? Well, I'll tell you what you do.* You do things like this. You make charts of all the wounds, charts of all the wounds that describe in great detail, all of the wounds inflicted on these victims, like you need to figure out what happened here.
>
> You can look at one photograph and you can figure out what happened here. This was a slaughter. This was crazy. But you know, if you don't have evidence, you're going to do something. *What you do, or at least what's been done in this case is they blow smoke, blow smoke in your eyes so that you can't see clearly in the hopes that you'll be so incensed by some of this stuff, that you will convict an innocent person.*

(Emphasis supplied).

Shorn of excess verbiage, the defense attorney's characterization of the actions and the ultimate intention of the assistant state's attorney was not subtle:

> [W]hat do you if you're a prosecutor and you have no evidence but you've got a terrible crime? I'll tell you what you do.
>
> [W]hat's been done in this case is they blow smoke in your eyes so that you can't see clearly **IN THE HOPE THAT** you'll be so incensed by some of this stuff that **YOU WILL CONVICT AN INNOCENT PERSON.**

That was a harsh indictment of the professional integrity of the assistant state's attorney. She was well within her rights to strike back as she did. The appellant's suggestion that her

parry may have cut deeper than his initial thrust, even if true, falls on deaf ears. It is with ill grace that one complains of an effective counterpunch.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**