814 A.2d 1

**Ismail M. WILSON, Travon McCoy and Robert Bryant**

v.

**STATE of Maryland.**

**No. 1649, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Dec. 24, 2002.

602

608

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief for appellant, Wilson), Baltimore. Brian J. Murphy, Assigned Public Defender (Stephen E. Harris, Public Defender, on the brief, for appellant, McCoy), Baltimore. Anne K. Olesen (Jennifer P. Lyman, on brief, for appellant, Bryant), Washington, DC.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., and Patricia Jessamy, State's Atty., for Baltimore City, on the brief), Baltimore.

Argued before MURPHY, C.J., and DAVIS, and PAUL E. ALPERT (Retired, specially assigned), JJ.

DAVIS, J.

The genesis of this appeal was the senseless quintuple murders and the criminal proceedings leading to the arrest and conviction of appellants. Appellants Ismail[1] Malik Wilson, Travon McCoy, and Robert Lamont Bryant were jointly

---

1. Appellant Wilson's first name is spelled "Ismeal" on the charging documents.

charged by indictment dated December 5, 1999 for (1) first degree premeditated murder of five victims—Levanna Lynette Spearman, Makisha Jenkins, Mary Helen Collein, Trennell Alston, and Mary McNeil Matthews, (2) use of a handgun in the commission of a felony or crime of violence, (3) wearing, carrying, and transporting a handgun, (4) openly wearing or carrying a dangerous and deadly weapon, and (5) wearing or carrying a concealed dangerous and deadly weapon as to each victim. They were separately indicted for conspiring to murder the above-named victims.[2]

In two nine-count indictments, appellants were charged with (1) robbery with a dangerous and deadly weapon, (2) robbery, (3) first degree assault, (4) second degree assault, (5) stealing property belonging to the complainant, (6) wearing, carrying, and transporting a handgun, (7) use of a handgun in the commission of a felony or crime of violence, (8) openly wearing or carrying a dangerous and deadly weapon, and (9) wearing or carrying a concealed dangerous and deadly weapon as to two of the victims—Alvin Eugene Thomas and Mary McNeil Matthews. They were charged in separate indictments for conspiring to rob Thomas and Matthews with a dangerous and deadly weapon. As to Thomas, they were additionally charged with conspiring to kidnap and, in a six-count indictment, they were further charged with two counts of kidnapping, use of a handgun in the commission of a felony or crime of violence, wearing, carrying, and transporting a handgun, openly wearing or carrying a dangerous and deadly weapon, and wearing or carrying a concealed dangerous and deadly weapon.

Wilson filed pre-trial motions on February 2, 2000 demanding, *inter alia*, a speedy trial and a request for discovery and production of documents. On March 17, 2000, Wilson filed a motion to compel discovery. Bryant filed similar motions on April 7, 2000. Motions for demand for a speedy trial and appropriate relief were filed by Wilson on June 23, 2000 and

---

**2.** Tariq Abdul Malik, Wilson's brother, was also indicted but tried in a different trial.

again on August 15, 2000. Wilson filed motions to compel discovery, pursuant to Maryland Rule 4–263(g), on February 26, 2001, one of which requested the State to produce physical evidence related to deoxyribonucleic acid (DNA) testing. McCoy filed a motion in demand of a speedy trial on May 31, 2001. The State filed a motion for appropriate relief concerning the Fifth Amendment rights of witness Ronald Lee McNeil on June 5, 2001. On June 11, 2001, each appellant renewed his exceptions to previous rulings denying the motions to dismiss for lack of a speedy trial. In addition, Wilson filed a motion pursuant to Maryland Rule 4–253(c) to sever in order to be heard in a separate trial. Various other motions and responses thereto were filed before trial began. Relevant pre-trial motions will be discussed, *infra.*

All of the pre-trial motions were heard on January 23–25, 2001 and June 11, 2001 in the Circuit Court for Baltimore City. The trial before a jury commenced in the Circuit Court for Baltimore City on June 12, 2001 and, on June 29, 2001, the jury convicted all three appellants and they were sentenced on September 24, 2001.

Both Bryant and McCoy were found guilty of five counts each of use of a handgun in the commission of a felony, conspiracy to commit murder, first degree murder and felony murder of Spearman, Jenkins, Collein, Alston, and Matthews. Bryant and McCoy were found not guilty of carrying a dangerous and deadly weapon with the intent to injure. Wilson was found guilty of five counts of first degree felony murder, use of a handgun in the commission of a felony, and conspiring to murder. He was neither found guilty of carrying a dangerous and deadly weapon with the intent to injure nor first degree murder of the five victims. Wilson, Bryant, and McCoy were found guilty of two counts each of robbery with a dangerous and deadly weapon, use of a handgun in commission of a felony, and conspiracy to rob with a deadly weapon, and one count each of conspiring to kidnap and kidnapping.

Wilson was sentenced to five consecutive life sentences, without the possibility of parole, for the counts of felony

murder. The trial judge merged the felony murder convictions with the convictions for use of a handgun in commission of a felony. For the five counts of conspiracy to murder, Wilson was sentenced to one term of life imprisonment (with the possibility of parole) consecutive to the other sentences. The trial judge merged all of Wilson's conspiracy to murder convictions into one.

Wilson was sentenced to twenty years, consecutive to the other sentences, for robbery with a deadly weapon of Thomas. Wilson was sentenced to an additional twenty years, the first five years to be served without the possibility of parole, for use of a handgun in the commission of a felony or crime of violence. Wilson was sentenced to another twenty-year consecutive sentence for conspiring to rob Thomas, thirty years consecutive for kidnapping Thomas, and thirty years consecutive for conspiracy to kidnap Thomas. For the additional crimes against Matthews, the trial judge merged the convictions for conspiring to rob, robbery with a deadly weapon, and the use of a handgun in the commission of a felony or crime of violence with the convictions for felony murder.

Bryant and McCoy were sentenced to five consecutive life sentences, without the possibility of parole, for the five counts of first degree murder. The judge merged the felony murder convictions with the first degree murder convictions. The lower court sentenced them to twenty years' imprisonment for the charge of using a handgun in the commission of a felony or crime of violence, five of which were without the possibility of parole, to be served consecutive to the other sentences. Bryant and McCoy were sentenced to life, which merged with the other four counts of conspiracy to murder, for one of the five counts of conspiracy to murder.

With respect to the indictment charging crimes against Thomas, they were sentenced to twenty years for robbery with a dangerous and deadly weapon, twenty years—five without the possibility of parole—for use of a handgun in the commission of a felony or crime of violence, thirty years for

kidnapping, and thirty years for conspiring to kidnap, which the judge merged with the conspiracy to rob conviction.

They were sentenced to twenty years for robbery with a dangerous and deadly weapon of Matthews and twenty years for use of a handgun in the commission of a felony or crime of violence. The conspiracy to rob with a dangerous and deadly weapon was merged with the conspiracy to murder convictions.

In his timely appeal, filed September 25, 2001, appellant Wilson raises seven questions for our review, some of which we have rephrased as follows:

I. Did the trial court err in denying appellant his Sixth Amendment right to a public trial?

II. Did the trial court err in denying appellant's motion to dismiss on the basis that appellant was denied his rights to a speedy trial?

III. Did the trial court err in denying appellant's motion for severance?

IV. Did the trial court err in excluding evidence which implicated an alternative suspect?

V. Did the trial court err by not propounding appellant's requested *voir dire* questions?

VI. Did the trial court err in allowing the State to argue in its closing argument that appellant failed to call witnesses in his defense?

VII. Is appellant entitled to reversal of all but one conviction and sentence for conspiracy?

Appellant McCoy filed his notice of appeal on September 26, 2001. Therein, he raises six questions for our review, some of which have been rephrased as follows:

I. Did the trial court err in denying appellant's motion to dismiss on the basis that appellant was denied his rights to a speedy trial?

II. Did the trial court err by imposing more than one sentence for conspiracy?

III. Did the trial court err in allowing the State to argue in its closing argument that appellant failed to call witnesses in his defense?

IV. Did the trial court err in excluding evidence which implicated an alternative suspect?

V. Did the trial court err in admitting letters written by a non-testifying party?

VI. Did the trial court err in denying appellant his Sixth Amendment right to a public trial?

On October 3, 2001, appellant Bryant filed his notice of appeal, and he has raised eight questions for our review, some of which we have rephrased as follows:

I. Did the trial court err by implicitly endorsing the testimony of a witness for the State?

II. Did the trial court err in declining to give the jury instructions requested by appellant?

III. Did the trial court err in excluding evidence which implicated an alternative suspect?

IV. Did the trial court err in denying appellant his Sixth Amendment right to a public trial?

V. Did the trial court err in denying appellant's motion to dismiss on the basis that appellant was denied his rights to a speedy trial?

VI. Did the trial court err by not propounding appellant's requested *voir dire* questions?

VII. Did the trial court err in allowing the State to argue in its closing argument that appellant failed to call witnesses in his defense?

VIII. Did the trial court err by imposing more than one conviction and sentence for conspiracy?

We answer Wilson's question VII, McCoy's question II, and Bryant's question VIII in the affirmative and the remaining questions posed by appellants in the negative, thereby vacating the convictions for conspiracy, except for the conviction for

conspiracy to commit murder; we affirm the remaining judgments of the circuit court.

## FACTUAL BACKGROUND

Alvin Thomas[3] testified that, on December 5, 1999, at approximately 6:00 p.m., he arrived at 1231 Gusryan Street, Baltimore, Maryland.[4] When Thomas knocked on the front door, Wilson answered and grabbed Thomas by the coat, pulling him into the house. Thomas further testified that he was struck on the head after which Wilson and Bryant pushed him down the stairs. McCoy and Tarek were also on the premises at this time, and all four men were armed. They demanded drugs and money. Thomas surrendered the three hundred dollars he had on his person. Appellants removed Thomas's leather jacket from his body and took his diamond watch, diamond bracelet, diamond ring, wireless phone, and pager.

Appellants then discussed whether Thomas was lying about not having any drugs or more valuables and contemplated going to Thomas's residence. Thomas called a friend—Darnell Collins—at appellants' request in order to obtain drugs, valuables, or money. Thomas and Collins agreed to meet at the McDonald's Restaurant on Greenmount Avenue. Follow-

---

3. Thomas was personally acquainted with appellants and the other victims. He characterized his relationships with them as follows: Thomas had been acquainted with Wilson since 1985 or 1986, and they attended middle school together. Thomas characterized Wilson as one of his best friends. Thomas was familiar with Tarek Malik—Wilson's brother—through Thomas's affiliation with Wilson. Bryant (referred to as "Nae") and Thomas have known one another "since he was a little boy." Thomas has known McCoy (referred to as "Fish") since approximately 1998. Collein was Thomas's mother; Ronald McNeil is Thomas's brother. Matthews (referred to as "Lo") was Thomas's sister. Jenkins (Matthews's daughter) was Thomas's niece. Spearman (referred to as "Stink") was his nephew's girlfriend, and Alston was the girlfriend of another nephew. Additionally, all of the victims were acquainted with one another and all three appellants.

4. The address is the home of Adrian Jones, with whom Thomas was engaged in a business enterprise, along with Jones's mother. The business was operated from the residence.

ing Thomas's conversation with Collins, Bryant asked Thomas, "What's over Lo's House?" [5] Although Thomas responded that he did not know, appellants retrieved Thomas's keys from his coat and placed Thomas in the back seat of his own car at gunpoint.

They all proceeded to Matthews's home at 3535 Elmley Avenue in Thomas's car; Bryant drove. Appellants walked Thomas to the front door, still at gunpoint, placed him at the front of the group, and rang the doorbell. Jenkins—Thomas's niece—came to the door. Bryant, who had been crouching down behind Thomas, stood up and placed a gun to Thomas's head. Bryant then opened the door and told Jenkins "to back up." All of the appellants and Thomas entered the home. McNeil and Spearman were also on the premises. Appellants demanded that McNeil lay on the floor and, when he did not immediately comply, they began kicking him. Appellants led Thomas and McNeil downstairs and, consequently, found Spearman lying on a bed in the basement. Spearman left the bed at their request. Bryant slapped her and told her to go upstairs to the first floor. Thomas, Jenkins, Spearman, and McNeil were instructed to lie down.

Bryant inquired as to what, if any, drugs, money, or valuables Matthews had in the house. No one knew ostensibly because Matthews routinely locked her bedroom door, to which only Matthews and one other individual had keys. Bryant further inquired as to which room belonged to Matthews. He subsequently led Jenkins upstairs. Wilson led Thomas upstairs, but stopped him on the steps. Thomas watched as Bryant and McCoy kicked Matthews's bedroom door in and began "looking around in there [and] throwing stuff."

Appellants were unable to find anything of value and began inquiring as to the whereabouts of the two individuals who occupied the room. Thomas was instructed to call Matthews

---

**5.** Appellants purportedly had bought drugs from Matthews in the past and suspected that she might have drugs and money in her home.

and, when he complied by calling her wireless phone, Matthews reportedly told Thomas that she was on her way back to the house. When Matthews arrived at 3535 Elmley Avenue, Thomas opened the door and Bryant placed a gun to Thomas's head. Bryant pulled Matthews into the house by her shirt. Thomas further testified that, as Collein walked up the stairs approaching the door, she was looking away and did not see what was happening in the door way. Wilson instructed Collein to come inside the house. Alston also did not foresee the danger ahead and, as she was carrying bags into the house, McCoy went outside and instructed her to "get up here." Collein's car, in which the victims had been traveling, was double parked outside the house with the car door still open.

According to Thomas, appellants had everyone inside at this point lying on the floor. Bryant asked Matthews, "Where the shit at [sic]?"[6] In response, Matthews repeatedly asked, "What's going on?" When Matthews did not tell appellants where to find drugs, money, or valuables, they threatened to shoot her daughter—Jenkins. Thomas asked them to take whatever they wanted in exchange for the safety of his family and then instructed Matthews to give appellants whatever she had. Appellants subsequently escorted Matthews upstairs; when they returned, Bryant was "pushing" money into his pockets.

Appellants then ordered the victims downstairs. Bryant went outside to move the car to the back of the house. Matthews made an attempt to talk with appellants and offered to take them to the bank. They declined and Bryant responded, "I didn't forget that shit you did to me." The exchange continued briefly and ended when appellants began laughing. Thomas further testified that Wilson then escorted him upstairs upon Bryant's instruction. Wilson and Bryant then took Thomas outside and they entered Thomas's car, which was parked at the rear of the house near the walkway.

---

**6.** In the trial transcript, Thomas explained that appellants were referring to drugs, money, or anything else of value.

Bryant and Wilson exchanged firearms and Bryant went back into the house. Approximately thirty seconds later, Thomas testified, he heard four gunshots coming from the house. Shortly thereafter, Thomas saw appellants run from the house and enter the car. Bryant asked, "Who capped Lo?"[7] McCoy answered, "I did. I did."

They proceeded to a nearby McDonald's Restaurant on Greenmount Avenue. Two of the passengers exited the car awaiting Collins's arrival. Appellants asked Thomas, "Where's he at [sic]?" Thomas responded, "He's coming." They drove to a telephone booth in order for Thomas to call Collins again. Both telephones were out of service, however, and Collins arrived before Thomas had an opportunity to telephone him. Collins backed his car into a parking space. Bryant drove close to Collins's car, blocking the car's movement and preventing Collins from leaving.

Thomas testified that Collins observed Bryant's driving and, when Wilson exited the car, Collins quickly alighted from his car and ran. Wilson and Bryant exchanged guns again and Wilson began chasing Collins. Bryant ordered Thomas to search Collins's car; Thomas complied. As Thomas searched underneath the seats of Collins's car, Bryant asked, "Where is it? Where is it?" Thomas heard gun fire at this time and assumed that Collins had been shot and killed by Wilson.

Thomas indicated to Bryant that what he was looking for could possibly be located inside the trunk of the vehicle. Thomas pulled the latch to the trunk from inside the car and began looking inside the trunk while Bryant continued to hold a gun to Thomas's head. Thomas suggested that the drugs might be located on the side where Bryant was standing. When Bryant looked down, Thomas threw clothing from the trunk over Bryant's head, and began to run with Bryant chasing him. Thomas heard Bryant's gun fall to the ground. He also heard Bryant utter expletives. Bryant, while calling

---

7. Thomas explained that he understood this conversation to mean who shot his sister.

for Wilson's assistance, caught up with Thomas and they began "tussling." Thomas eventually escaped into a nearby bar and the owner telephoned the police.

Additional pertinent facts will be provided as warranted.

## LEGAL ANALYSIS

### I

Wilson, Bryant, and McCoy contend that their Sixth Amendment [8] right to a public trial has been abridged because a deputy sheriff assigned to the courtroom denied access to spectators attempting to enter the courtroom as the jury was rendering its verdicts. As a consequence, appellants aver, they are entitled to reversal or at a minimum a limited remand. In response, the State first argues that this issue has not been properly preserved as it pertains to McCoy.[9] The State additionally argues that appellants' contention is without merit because the trial court never closed the court-room and, assuming, *arguendo,* there was a closure, it was " 'narrowly tailored' and served 'an overriding governmental interest.' "

At trial, counsel made a motion for a mistrial and for a new trial, which was denied on the basis that that the courtroom had not been closed. On September 24, 2001, the day that appellants were sentenced, the following exchange took place between Wilson's counsel, who argued the motion, and the court:

---

8. In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed; which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him [or her]; to have compulsory process for obtaining witnesses in his [or her] favor, and to have the assistance of counsel for his [or her] defense.
U.S. Const. amend. VI.

9. McCoy has not asked us to address the issue.

[WILSON'S COUNSEL]: And then the last and final ground on which I base my motion for a mistrial—for a new trial, Your Honor, is the fact that the Sheriff's Department again took it upon themselves to close the courtroom. It is my understanding—and I have submitted an affidavit from another attorney in my office, Angela Shelton—that when we received word that a jury had reached a verdict, everyone came back to the courtroom. I admit and I concede that the courtroom was crowded. I do not know whether it was standing room only, but I do concede that every seat in the courtroom was full.

However, when Ms. Shelton tried to enter with a group of other people, the sheriff denied them entrance to this courtroom prior to the verdict being taken and other people were also turned away while she was turned away. Taking—

THE COURT: I guess my problem with that is, one, obviously I did not give an order for the courtroom to be closed.

[WILSON'S COUNSEL]: That's correct.

THE COURT: And my recollection is that people were coming and going throughout the proceeding, so I'm not—I cannot find as a fact that the courtroom was, in fact, closed. I don't know what specific interaction Ms. Shelton had with any individual deputy—

. . .

[WILSON'S COUNSEL]: What I was saying is that when we were coming to take the verdict there was another huge jury pool in here to select another jury, so there was mass confusion with this huge crowd leaving as this huge crowd was coming in. But, nevertheless, when the verdict was taken in court there were people who sought access to this courtroom. Ms. Shelton has submitted an affidavit, and if the [c]ourt needs further evidence we're trying to track her down. I don't see her in the courtroom yet. She did try to gain access. If even one person

of the public is denied access to a courtroom, that has essentially shut off the courtroom. Once the courtroom—

THE COURT: I don't think any appellate court has adopted the one person who has limited access to the courtroom is a courtroom of a closed trial, [appellant's counsel].

[WILSON'S COUNSEL]: Well, it's not just one person, Your Honor. We don't know the names of other people, but in Ms. Shelton's presence other potential spectators who also sought access to the courtroom were denied their ability to enter.

THE COURT: Uh-huh.

[WILSON'S COUNSEL]: Now, under the case law as I read it this court would have had the right to close the courtroom because there weren't any more seats; however, it's not the sheriff's job to do that, it is the [c]ourt's job to do that, and the [c]ourt under the case law, has to make findings as to why the public is being denied access to the courtroom because it is overcrowded and then issue an appropriate order. Because the sheriff took it upon himself to act without consulting with the [c]ourt, he essentially closed the courtroom to the public and he denied my client the right to a public trial guaranteed under the Sixth Amendment and under the Declaration of Rights, the Maryland Constitution.

THE COURT: Well, noting that the courtroom was crowded with people, noting that there was press access, noting and recording deference to my recollection that people came and went throughout the proceedings, I find as a fact that the courtroom was not closed.

The State, on September 24, 2002, asked the court for clarification regarding the matter. The following colloquy took place:

[THE STATE]: Your Honor, I would also say, in support of the [c]ourt's finding, that obviously the verdict, assuming it is, in fact, a part of the trial that we need to be

concerned with, that the public was here, both in terms of the general public, the press, and any family members.

THE COURT: The courtroom was crowded. I'm not sure you could have gotten any more of the public in. But, as I said, if they—my recollection is that during the verdict there were people coming and people coming in to take standing positions at various times, so I did not order the courtroom closed, first of all, although I think there would have been sufficient basis for ordering closed, perhaps given the capacity which had certainly been exceeded in the courtroom, but I did not order the courtroom closed, and I think as a factual matter the courtroom was not closed.

In support of their contentions, appellants cite *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *Watters v. State*, 328 Md. 38, 612 A.2d 1288 (1992); *Holt v. State*, 129 Md.App. 194, 741 A.2d 519 (1999); *Walker v. State*, 125 Md.App. 48, 723 A.2d 922 (1999); and *Walker v. State*, 121 Md.App. 364, 709 A.2d 177 (1998), which are all distinguishable from the instant case. We explain.

In *Waller*, the Georgia State Police placed wire taps on specific telephone lines for approximately six months during the year 1981. The information received as a result led to the indictment and prosecution of charges related to a lottery operation which serviced bets placed on the trading volume of the New York Stock Exchange. One of the parties accused moved to suppress the information obtained from the wiretaps and all of the evidence acquired by searches conducted by the officers.

The State moved to close the suppression hearing to all members of the public. The State argued that introducing the evidence in the presence of the public had the propensity of infringing upon the expectation of privacy of those other than the defendants involved in that specific case.[10] The trial court granted the State's motion and the courtroom was closed to

---

10. There were separate trials of over thirteen defendants.

the public with the exception of the defendants and their respective counsel, witnesses, and court personnel. The tapes were played for two and one-half hours during a hearing that lasted seven days.

The Georgia Supreme Court held that the trial court properly balanced the privacy rights of others against the accused right to a public hearing and affirmed the convictions. In reversing the holding of the state court, the United States Supreme Court held that the Sixth Amendment applies to suppression hearings. The Court explained that,

[u]nder *Press Enterprise [Co. v. Superior Court of California, Riverside County,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) ], the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Waller,* 467 U.S. at 48, 104 S.Ct. 2210.

*Waller* and the principles promulgated therein do not apply to the instant case because the trial court never closed the courtroom. The State, in *Waller,* made a motion and supporting arguments as to why the courtroom should be closed. The trial court agreed with the State's arguments. In the case *sub judice,* there were no motions or arguments in support thereof. The trial judge concluded that the courtroom was not closed.

In *Watters,* appellant was convicted of first degree murder and related offenses. He was subsequently sentenced to life imprisonment without the possibility of parole. The facts surrounding the trial, like the instant case, were highly publicized.

The first morning of the trial consisted only of *voir dire* and jury selection, during which time a deputy sheriff denied the public access to the courtroom unbeknownst to the trial judge. The deputy sheriff only allowed courtroom personnel, witnesses, and prospective jurors to enter, although there were

empty seats in the courtroom. Acting on his own initiative, without the instruction of the trial judge, he refused entrance to appellant's relatives. The record did not disclose dispositively whether members of the press were also denied access.

Counsel moved for a mistrial and the trial judge denied the motion because, the judge explained, "it was done as a matter of court security because of the crowded conditions of the courtroom, and it is not denying him his right to a public trial." *Watters*, 328 Md. at 43, 612 A.2d 1288. Citing *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), and *Press–Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), the Court of Appeals held that "[t]he circumstances at this trial did not present a compelling need for excluding members of the defendant's family as well as the press and the public. The record, although lacking in desirable particulars, establishes that there were seats available during the voir dire and jury selection." *Id.* at 45. The Court further noted that "the more concrete benefits to the defendant of a public trial ... 'in addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourage perjury.'" *Id.* at 47 (quoting *Waller*, 467 U.S. at 46, 104 S.Ct. 2210).

The facts in *Watters* are somewhat similar to the case *sub judice* because both cases were highly publicized and the Sheriff's Department was acting with neither the instruction nor consent of the trial judge. Notwithstanding, *Watters* is also dissimilar to the case *sub judice*. The deputy sheriff excluded the public as a whole including the defendant's family and the press, despite the fact that there were empty seats. In the instant case, the record clearly reflects a crowded, noisy, frenetic courtroom. The public, as a whole, was present. Appellant's counsel conceded this fact at trial. "I admit and I concede that the courtroom was crowded. I do not know whether it was standing room only, but I do concede that *every seat in the courtroom was full*." *Watters* is not on point with the instant case.

In *Holt v. State,* 129 Md.App. 194, 741 A.2d 519 (1999), the State moved to have the courtroom closed to avoid any intimidation of the State's witness. The trial judge granted the motion without any supporting evidence. On appeal we explained, citing *Walker v. State,* 121 Md.App. 364, 709 A.2d 177, *cert. denied,* 351 Md. 5, 715 A.2d 964 (1998), that, "Absent such supporting evidence . . . it is unclear whether the trial judge's order was narrowly tailored to the exigencies of the case." *Holt,* 129 Md.App. at 206, 741 A.2d 519. We expounded, stating "that a trial judge may not encroach upon a defendant's right of confrontation by clearing the courtroom of a defendant's family members 'without conducting an examination to ascertain the accuracy or validity of the State's proffer.'" *Id.* (quoting *Walker v. State,* 121 Md.App. 364, 709 A.2d 177 (1998)). We concluded:

> The case . . . suffer[ed] from the same omission as the other cases cited. The trial court acted upon the suggestion by the State that one witness had been threatened by the defendants and could not be located for trial. . . . As the proponent of the closure motion, however, it was incumbent on the State to produce evidentiary support that [would have] provide[d] the basis for the court to construct a narrowly tailored order to warrant closure.

*Id.* at 207, 741 A.2d 519.

The appellant, in *Walker v. State,* 121 Md.App. 364, 709 A.2d 177 (1998), was convicted of child abuse and second degree sexual offenses. During trial, the judge ordered appellant's family members to leave the courtroom while the victims, who were the daughters of his former girlfriend, testified. On appeal, appellant sought review of his convictions averring that he had been deprived of his Sixth Amendment right to a public trial. We held:

> It is incumbent upon the trial judge to make more than a general finding that all children suffer trauma when testifying or, as in this case, not to encroach upon the defendant's right of confrontation by clearing the courtroom of all of the defendant's family members without conducting an examination to ascertain the accuracy or validity of the State's

proffer. We hold that, in the absence of such evidence, we cannot determine from this record whether the trial judge's order was narrowly tailored to the exigencies of the case at hand and, as a consequence thereof, the court abused its discretion.

*Walker*, 121 Md.App. at 373–74, 709 A.2d 177.

Finally, in *Walker v. State*, 125 Md.App. 48, 723 A.2d 922 (1999), appellant's family members became upset and began to scream after a State's witness attacked appellant during trial. As a consequence thereof, the trial judge barred the family members from the remainder of the court proceedings. On appeal, the appellant contended that he had been denied a public trial as guaranteed by the Sixth Amendment. We held that "the courtroom fracas, when considered in light of all the circumstances and the fundamental importance of the right to a public trial, did not justify the broad closure order imposed by the court." *Id.* at 67, 723 A.2d 922. We further held that the trial judge abused her discretion by excluding the defendant's family from the entire trial. Consequently, we reversed the judgment of the trial court. The standard one must consider when closing a courtroom is clear. "The public may only be excluded ... 'pursuant to a narrowly tailored order necessary to protect an overriding State interest.'" *Walker*, 121 Md.App. at 373, 709 A.2d 177 (quoting *Watters*, 328 Md. at 45, 612 A.2d 1288).

■ As are the other cases cited by appellant pertaining to a defendant's right to a public trial, *Holt, Walker,* and *Walker, supra,* are easily distinguished from the instant case. A closure order narrowly tailored to the exigencies of the case is only required when the public has been excluded. Recalling that spectators were "coming and taking standing positions at various times" during the taking of the verdict and the fact that the seating capacity of the courtroom had been exceeded, the trial judge stated that, "as a factual matter," he did not order the courtroom closed. Although the rendering of the verdict is clearly a part of the proceedings and should be open to the public as should be every other phase of the proceed-

ings, contrary to the doubts expressed by the prosecutor, notably, appellants' complaints are directed at only a very limited period of time—the rendering of the verdict. The circumstances of the case at bar present neither the vagaries of the Star Chamber or secret tribunal atmosphere. Nor were the judge, prosecutor, and witnesses shielded from the illuminating glare of public scrutiny as they performed their respective duties. The guarantees of an open and public trial were not violated in the proceedings below.

## II

Each appellant contends that he was denied his constitutional Sixth Amendment [11] right to a speedy trial and, therefore, the trial judge erred in denying his motion to dismiss. In response, the State argues that each appellant was "afforded a timely trial." The following is the chronology of the proceedings: [12]

Dec. 5, 1999—Offenses committed.

Dec. 7, 1999—Wilson arrested.

Dec. 8, 1999—McCoy arrested.

Dec. 16, 1999—Bryant arrested.

Feb. 2, 2000—Defense Attorney Bridget Shepard enters her appearance for Wilson, and files motions for, *inter alia,* speedy trial, document production, and request for discovery.

Mar. 7, 2000—Defense Attorney Arcangelo Tuminelli enters his appearance for Bryant.

Mar. 17, 2000—Appellants arraigned. Date of trial set for July 6, 2000.

Counsel for Wilson files motion to compel discovery.

---

11. See n.8, *supra.*

12. The State indicates that all parties agree with the chronology it presented. However, we have incorporated the information we have received from all appellants. Further, redactions were made when information could not be confirmed by the record docket entries.

Defense Attorney William Purpura enters his appearance for McCoy.

Apr. 7, 2000—Counsel for Bryant files motions for speedy trial, production of documents, and request for discovery.

Apr. 18, 2000—State files Supplemental Disclosure I.[13]

May 5, 2000—State files Supplemental Disclosure II.

May 11, 2000—State files Supplemental Disclosure III.

May 12, 2000—State files notice of intent to use DNA as evidence.

June 7, 2000—Counsel for Wilson files motion for discovery relating to DNA evidence.

June 12, 2000—Initial July 6, 2000 trial date postponed. Over appellants' objection that the State had waited six months to submit evidence for DNA testing, Administrative Judge David Mitchell found good cause for postponement on the basis of unavailability of DNA results, and counsel for two of the co-appellants were scheduled to try cases in federal court.

June 14, 2000—State files Supplemental Disclosure V.

June 20, 2000—State files Supplemental Disclosure IV.

June 23, 2000—Counsel for Wilson files motions in demand of a speedy trial and appropriate relief.

June 30, 2000—Discovery hearing conducted by Judge John N. Prevas. The State informed the court that the crime laboratory had not completed its work, so DNA discovery was not possible. The court set schedule for disclosure of, *inter alia*, DNA and fingerprint evidence.

July 3, 2000—State files Supplemental Disclosure VII.

July 6, 2000—Judge Prevas's Order from the June 30, 2000 hearing filed.

---

**13.** The State indicates that, in mid-April, it was initially advised that blood stained money was recovered from Wilson's person and it requested an analysis of the money from the Baltimore City Police Department (BCPD) Trace Analysis Unit. The money was retrieved from evidence control and transferred to the Trace Analysis Unit and, on May 2, 2000, various items were sent to BRT Laboratories for DNA testing.

State files Supplemental Disclosure VIII.

July 31, 2000—State files Supplemental Disclosure IX.

Aug. 11, 2000—Hearing before Judge Roger W. Brown. Wilson's counsel moved to suppress evidence due to State's delay in initial submission of DNA materials, and failure to comply with Judge Prevas's scheduling order. Wilson moved for a postponement due to inability to prepare for trial without discovery. Judge Brown denied the postponement request and directed parties to litigate before the trial judge the admissibility of the belatedly-disclosed evidence.

Aug. 15, 2000—Counsel for Wilson files second demand for speedy trial and motion for appropriate relief.

Aug. 17, 2000—Supplemental DNA discovery provided, but [a]ppellant asserts before Judge Carol Smith that "raw data," "first-generation materials," and technicians' bench notes were required to be provided, but had not been.

Aug. 18, 2000—State files Supplemental Disclosure X.

Aug. 30, 2000—Discovery hearing regarding the results of the DNA testing.

Sept. 5, 2000—Case postponed in advance of scheduled September 19, 2000 trial date until January 23, 2001 due to Bryant's counsel being in a federal trial and Wilson's request. McCoy objects to the postponement. Good cause found by Administrative Judge, David B. Mitchell.

Sept. 19, 2000—Next scheduled trial date. Postponed at appellants' request because discovery had still not been fully provided.

Oct. 5, 2000—Supplemental disclosure by the State.

Dec. 21, 2000—State's supplemental disclosure XII.

Jan. 10, 2001—State's supplemental disclosure XIII.

Jan. 17, 2001—State's supplemental disclosure XIV.

Jan. 23, 2001—Wilson moves to dismiss for speedy trial violation. Judge Ross denies the motion on the basis that the 13-½ month delay to that point was not of constitutional dimension. Judge Ross sends case to Judge Mitch-

ell (administrative judge) with a recommendation that it be postponed because the State had delayed disclosure of McNeil's statements to Harrison and Figueroa, which were at least arguably exculpatory.

Not guilty pleas entered

Jan. 24, 2001—Judge Mitchell, noting that the State had played discovery 'close to the vest,' that 'this is the consequence,' and that the parties were coming dangerously close to a speedy trial violation, reluctantly granted postponement. The court expressly declined to make a finding of good cause.[14]

Jan. 24, 2001—Motion to sequester witness is granted; motion to dismiss for lack of a speedy trial is denied; motion to dismiss for prosecutorial misconduct is denied; motion to sever is denied; motion for DNA discovery is granted.

Feb. 26, 2001—Wilson files motions to compel discovery.

Mar. 5, 2001—State responds to motion to compel discovery.

Mar. 6, 2001—State responds to second motion to compel discovery.

June 4, 2001—State provides supplemental disclosure.

June 11, 2001—Motion to dismiss on Sixth Amendment and Rule 4–271 grounds renewed before Judge Quarles, and denied.

---

**14.** Directing his comments to the State, the trial judge noted:

This is not yesterday's simple homicide. These folks are defending these individuals who have a right to a defense, and you can't expect this is going to roll over from one day to the next.

You play it close to the vest, this is the consequence.

And you've put—and the other thing that is going to happen is, because of the trial schedules of the lawyers, this case is going to become dangerously close to a constitutional speedy trial issue. One counsel's not available for six months after March .... do you realize you're asking me to put this case in September, 2001? That's incredible.

. . .

You asked about sanctions. You may get the sanction you did not want or wanted. It may be, unfortunately, the ultimate sanction of a dismissal of this case for lack of a speedy trial.

June 11, 2001—Trial begins with the presiding judge hearing pre-trial motions.

■ To be sure, the time that transpired between the dates on which appellants were arrested and the date on which trial began, satisfies the threshold requiring review of the delay. The length of the delay is but one factor in our determination of whether appellants' constitutional rights to a speedy trial have been abridged. *Barker v. Wingo*, 407 U.S. 514, 523, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (explaining that the Supreme Court "find[s] no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months"). Instead, we must be guided by the balancing test set forth in *Barker* and its progeny.

■ The State, as well as each appellant, agree, as they must, that our analysis is pursuant to *Barker* and the principles promulgated therein. In determining whether appellants were denied a speedy trial, we first look to the four *Barker* factors.

A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express then in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

*Id.* at 530, 92 S.Ct. 2182. *See also Glover v. State*, 368 Md. 211, 792 A.2d 1160 (2002). We discuss each factor in turn.

### LENGTH OF DELAY

■ In the case *sub judice*, the delay was more than eighteen months, which is deemed "presumptively prejudicial" and certainly a sufficient amount of time to "trigger" an analysis of the issue using the *Barker* factors. *Glover*, 368 Md. at 223–24, 792 A.2d 1160 (citing *Divver v. State*, 356 Md. 379, 389–90, 739 A.2d 71 (1999); *Brady v. State*, 291 Md. 261, 434 A.2d 574, (1981); *Jones v. State*, 279 Md. 1, 367 A.2d 1,

(1976); *Epps v. State,* 276 Md. 96, 111, 345 A.2d 62 (1975); *Battle v. State,* 287 Md. 675, 686, 414 A.2d 1266 (1980)). Generally, a delay exceeding one year and fourteen days is presumptively prejudicial. However, citing *Glover v. State,* 368 Md. 211, 223, 792 A.2d 1160 (2002); *Ratchford v. State,* 141 Md.App. 354, 360, 785 A.2d 826 (2001); *State v. Tortolito,* 124 N.M. 368, 950 P.2d 811, 814–15 (1997); *Hull v. State,* 687 So.2d 708, 730 (Miss.1996); *State v. Davis,* 903 S.W.2d 930, 936 (Mo.Ct.App.1995); *Commonwealth v. Lanigan,* 419 Mass. 15, 641 N.E.2d 1342, 1345 (1994); and *Smith v. Deppish,* 248 Kan. 217, 807 P.2d 144, 150 (1991), the State argues that eighteen months is not an unreasonable amount of time given the complexity of the case.

In discussing the first prong of the *Barker* factors, the Court of Appeals, in *Glover,* reasoned that "the delay that can be tolerated is dependent, at least to some degree, on the crime for which the defendant has been indicted." *Glover,* 368 Md. at 224, 792 A.2d 1160 (citing *Barker,* 407 U.S. at 531, 92 S.Ct. 2182). The Court of Appeals contrasted *Divver v. State,* 356 Md. 379, 739 A.2d 71 (1999), in which appellant was being tried for driving under the influence and a delay of twelve months and sixteen days was held unreasonable.

Notwithstanding, the fact that trial did not commence for over eighteen months is not dispositive. The Court of Appeals held, in *Erbe v. State,* 276 Md. 541, 547, 350 A.2d 640 (1976), that "delay is the least conclusive of the four factors identified in *Barker.*" *Erbe,* 276 Md. at 547, 350 A.2d 640 (quoting *United States v. Brown,* 354 F.Supp. 1000, 1002 (E.D.Pa. 1973)). Indeed, in *Barker,* the delay was in excess of three years, yet not held unreasonable when balanced with the other factors.

In *Ratchford v. State,* 141 Md.App. 354, 785 A.2d 826 (2001), appellant was convicted of two counts of first degree murder, one count of second degree murder, and other related offenses. We held that a delay of eighteen months was not particularly remarkable in light of the other factors, most notably, the reason for the delay. Were we to conclude that

there were extenuating circumstances embodied in the three remaining prongs, *infra*, an eighteen-month delay would not be inordinate.

## REASON FOR DELAY

In *Glover*, appellant, who was arrested and indicted for murder, was confined for over fourteen months and the trial date was postponed three times before trial actually commenced. The delay was due to the unavailability of a presiding judge and jurors as well as circumstances surrounding DNA testing. The trial court held that appellant's right to a speedy trial had been infringed. We reversed. The Court of Appeals granted *certiorari* and affirmed our holding.

The unavailability of a judge was held to be a neutral factor. The unavailability of DNA results was held "valid justification" under the circumstances. The State, however, was partially responsible for the delay because it failed to comply with the disclosure guidelines of the DNA testing. Notwithstanding, the Court of Appeals explained that,

> [d]espite our admonition for the State's lack of diligence when the case was postponed for the third time, the delays in petitioner's case, as a whole stem largely from neutral reasons. In addition, the State appears to have been as concerned with the delays as the petitioner and there is not the slightest implication that the State failed to act in good faith.

*Glover*, 368 Md. at 228, 792 A.2d 1160.

In *Ratchford*, the Court characterized the case as complex because multiple co-defendants were charged with the deaths of three murder victims. Additionally, there were many witnesses and DNA test results to examine. Some of the delays were attributable to the State and others to the defendant. We held that appellant "was not ready to go to trial on those serious charges." *Ratchford*, 141 Md.App. at 362, 785 A.2d 826 (noting that "It is not a case in which a defendant, ready and eager to resolve the charges against him, was unconstitutionally denied his right to a speedy trial.").

In the case *sub judice,* the crimes at issue include multiple counts of conspiracy, robbery, murder, and other related offenses. There are multiple victims, multiple defendants, and numerous witnesses. To be sure, the prosecution was required to gather and prepare for presentation reports of the autopsy examination, ballistic, fingerprint, and DNA examinations. The fact that the case involved three co-defendants and five victims would surely account, to some degree, for an extended period of time necessary for preparation. We are not convinced, however, that the case was of such complexity as to require eighteen months for it to be brought to trial.

Initially we note that, on May 12, 2000, three months after Wilson filed his motion for speedy trial and one month after Bryant filed his motion for speedy trial, the State filed its notice of intent to use DNA evidence. The initial trial date, June 12, 2000, was postponed over appellants' objections that the State had waited six months to submit evidence for DNA testing. Although the initial July 6, 2000 trial date was postponed because of the unavailability of the DNA results—a reason chargeable to the State for not ordering same—the administrative judge also postponed the case for good cause on the basis that counsel for two of the co-appellants were scheduled to try cases in federal court.

After the State filed its fourth and fifth supplemental disclosure on June 14 and 20, 2000, Wilson renewed his motion for a speedy trial on June 23, 2000 and, on June 30, 2000, the State informed the court at the discovery hearing that the results of the DNA tests were not ready. On July 6 and 31, 2000, the State filed its supplemental disclosure VIII and IX. A motion to suppress DNA evidence for failure to comply with Judge Prevas's scheduling order was filed on August 11, 2000. Wilson moved for a postponement due to inability to prepare for trial without discovery.

On August 17, 2000, counsel complained that the supplemental DNA discovery that had been provided did not include the "raw data," "first-generation materials," and the technicians' bench notes. The next day—August 18, 2000—the State filed

its supplemental disclosure X. The sixty-day delay between the initial trial date of July 6, 2000 and September 5, 2000 was the result of the State's failure to provide DNA evidence and to otherwise comply with disclosure. We note, however, that Wilson had filed his motion for production of documents and request for discovery on February 2, 2000 and Bryant had filed his motion for production of documents and request for discovery on April 7, 2000, seven months and five months, respectively, after the requests for discovery. Had the prosecution made timely requests to the laboratory for the evidence needed to prepare for trial, the prosecution could have obviated one obstacle to a speedy trial.

On September 5, 2000, the scheduled trial date of September 19, 2000 was postponed four months to January 23, 2001 at the request of appellant Wilson and the fact that Bryant's counsel was engaged in a federal trial. McCoy, however, objected to the postponement. The four-month delay as to Bryant and Wilson is chargeable to the defense. In the interim between September 19, 2000 and January 23, 2001, the State filed supplemental disclosure XI (October 5, 2000), State's supplemental disclosure XII (December 21, 2000), State's supplemental disclosure XIII (January 10, 2001), and State's supplemental disclosure XIV (January 17, 2001).

The motion to dismiss for lack of a speedy trial was denied on January 23, 2001 on the basis that the thirteen and one-half month delay to that point in time was not of constitutional dimension. On that same day, the case was referred to the administrative judge with a recommendation that it be postponed because the State had failed to disclose arguably exculpatory statements of McNeil to Harrison and Figueroa. On January 24, 2001, Judge David Mitchell observed that the State had played discovery "close to the vest" and that the parties were coming dangerously close to a speedy trial violation. Notably, he expressly declined to make a finding of good cause. The postponement "reluctantly" granted on January 24, 2001, was made to permit appellants to file motions to compel discovery on February 26, 2001, which the State answered on March 6, 2001 and June 4, 2001. The four and

one-half month delay from January 24, 2001 until the trial began on June 11, 2001 is clearly chargeable against the State for having, as the administrative judge characterized it, "played discovery too close to the vest." Thus, three months under *Barker v. Wingo* for a complex case would be considered necessary for normal preparation and may be viewed as neutral; four months are chargeable against the defense because counsel requested the postponement for their convenience; six months are chargeable against the State for failure to secure promptly the DNA and other evidence necessary for trial; and three and one-half months are heavily weighed against the State for its lack of diligence in complying with discovery requirements related to ostensibly exculpatory evidence. On balance, we are constrained to conclude that the State acted dilatoriously and therefore much of the reason for the delay must be laid at the doorstep of the prosecution.

Appellant Wilson also argues that, had the circuit court severed his case and consolidated it with the fourth co-defendant Tariq Malik, he could have been afforded a speedy trial without being hampered by the schedules of counsel for his co-defendants who requested postponements because of conflicts in their trial schedules. Ideally, in retrospect, severance and consolidation with the fourth co-defendant may very well have served the purpose of more expeditiously bringing Wilson to trial; however, one could not know the trial schedule for Malik or whether the same impediments created by having his trial joined[15] to the trials of Bryant and McCoy would have persisted with one co-defendant.

With regard to the reasons for the delay, we are troubled that the State requested DNA testing six months after appellants filed motions for discovery. Nevertheless, we are not persuaded that the State's actions constitute misconduct or bad faith. Conflicts with the schedules of the other two defense counsel is a neutral reason for delay. The State's

---

**15.** We will address appellants' severance issues, *infra*.

noncompliance with the discovery schedule is clearly the most egregious violation.

## ASSERTION OF THE RIGHT

The record clearly indicates that Wilson filed motions persistently, asserting his right to a speedy trial. Wilson requested a postponement after the long wait for the DNA results on the basis that the State's failure to comply with discovery hampered trial preparation. Our review of the record discloses no specific arguments from Bryant. McCoy, on the other hand, objected to each postponement. Thus, Wilson and McCoy strenuously asserted their Sixth Amendment rights to a speedy trial.

As to Bryant, the Supreme Court, in *Barker*, spoke directly to the need to make known the sincere desire to have one's case decided expeditiously:

> More important than the absence of serious prejudice, is the fact that Barker did not want a speedy trial. Counsel was appointed for Barker immediately after his indictment and represented him throughout the period. No question is raised as to the competency of such counsel. Despite the fact that counsel had notice of the motions for continuances, the record shows no action whatever taken between October 21, 1958, and February 12, 1962, that could be construed as the assertion of the speedy trial right. On the latter date, in response to another motion for continuance, Barker moved to dismiss the indictment. The record does not show on what ground this motion was based, although it is clear that no alternative motion was made for an immediate trial. Instead the record strongly suggests that while he hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried.

*Barker*, 407 U.S. at 534–35, 92 S.Ct. 2182 (footnotes omitted).

██ Bryant is foreclosed from any challenge of his conviction on the basis of the denial of the right to a speedy trial by virtue of his failure to assert the right.

### PREJUDICE

Appellants argue that they were prejudiced by the length and nature of their pre-trial incarceration. They were placed on "lockdown" because of the nature of the crimes for which they were accused and, consequently, only permitted to leave their cells for one hour each day. McCoy was in solitary confinement for the majority of his incarceration. Appellants further argue that the value of their witness testimony was diminished in value as a result of the delay. Discussing the weighing of prejudice in a *Barker* analysis, the Supreme Court observed:

> A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pre[-] trial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his [or her] case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Id.* at 532, 92 S.Ct. 2182.

The Court continued, explaining how prejudice is measured:

> Two counterbalancing factors, however, outweigh these deficiencies. The first is that prejudice was minimal. Of course, Barker was prejudiced to some extent by living for over four years under a cloud of suspicion and anxiety.... But there is no claim that any of Barker's witnesses died or otherwise became unavailable owing to the delay. The trial transcript indicates only two very minor lapses of memory—

one on the part of a prosecution witness—which were in no way significant to the outcome.

*Id.* at 534, 92 S.Ct. 2182.

Of course, appellants endured anxiety and concern, as any normal defendant would react to the uncertainty of pre-trial status and the prospect of incarceration. Further, they, undoubtedly, experienced oppressive pre-trial incarceration and were ineligible for pre-trial release due to the heinous nature of the crimes charged and the threat they posed were they to be granted pre-trial release. The most important factor establishing prejudice, however, is the inability to prepare one's defense. Beyond a general complaint that the value of their witness testimony "was diminished," neither Wilson, Bryant, nor McCoy contend that witnesses died or specifically had faded memories due to the delay. Nor do they point to any other hindrance occasioned by their inability to have their cases tried more promptly. In view of the complexity and gravity of the case, we accord great weight to the lack of any significant prejudice resulting from the delay.

## BALANCING OF THE FOUR FACTORS

Under *Barker*, because Bryant failed to demand that he be accorded a speedy trial, he cannot complain. Accordingly, Bryant's failure to demand his right to a speedy trial precludes him from now seeking a dismissal of the charges against him on that basis. As we have noted, both Wilson and McCoy vigorously asserted their rights to be brought promptly to trial. Although the initial trial date of July 6, 2000 had to be postponed because of the State's failure to submit evidence for DNA testing, counsel for Bryant and McCoy were unavailable because of trial scheduled in federal court. The next scheduled trial date, September 19, 2000, was postponed at Wilson's request and because Bryant's counsel was scheduled for trial in federal court; McCoy objected to that postponement. Although Wilson repeatedly asserted his right to a speedy trial, he requested or acquiesced in postponement

requests that resulted in delays from July 6, 2000 to February 26, 2001.

Notwithstanding Wilson's request for postponements during that period, much of the delay was caused by the State's failure to provide the DNA evidence. The delay from February 26, 2001 until the trial commenced on June 11, 2001 was exclusively the result of the State's failure to provide discovery as requested. As to Wilson, twelve months of the delay are chargeable to the State, with the last four months heavily weighed against the State for its failure to comply with discovery. As to McCoy, the delay between July 12, 2000 and September 19, 2000, in part, resulted from his request for a postponement because he was engaged in trial in federal court. The delay from September 19, 2000 to June 11, 2001 is chargeable against the State. In our view, the lack of diligence in providing counsel for Wilson and McCoy discoverable materials, including the six month delay in submitting evidence for DNA testing, would warrant a dismissal of the charges against them were they able to establish demonstrable prejudice.

As we have mentioned, Wilson and McCoy are unable to establish that the delay, clearly of constitutional dimension, in any way impaired their ability to present their defense. We are troubled at the State's handling of this case, as was Judge David Mitchell, who noted that the State "had played the discovery close to the vest" and "that the parties were coming dangerously close to a speedy trial violation." Nevertheless, because the delay was occasioned, in part, by the request of counsel for postponements and because of the complexity and gravity of the case, we hold that the eighteen-month delay did not deny appellants their rights to a speedy trial.

### III

The trial judge convicted appellants of conspiracy to commit murder, conspiracy to commit robbery, and conspiracy to commit kidnapping. Appellants argue that only one conviction and sentence for conspiracy as to each appellant can

stand. In support of their argument, they quote footnote eleven from *Campbell v. State*, 325 Md. 488, 507–08 n. 11, 601 A.2d 667 (1992), which states: "A conspiracy may have more than one object. However many objects a conspiracy may have, only one *sentence* may be imposed. Where a defendant is found guilty of conspiracy to commit two crimes, the crime that carries the more severe penalty is the guideline offense for purposes of sentencing." (Citations omitted; emphasis added.)

The State agrees with appellants' argument, citing *Jordan v. State*, 323 Md. 151, 161, 591 A.2d 875 (1991) (citing *Tracy v. State*, 319 Md. 452, 459, 573 A.2d 38 (1990)). "It is well settled in Maryland that only one sentence can be imposed for a single common law conspiracy no matter how many criminal acts the conspirators have agreed to commit." Therefore, all of the sentences for conspiracy with the exception of one must be vacated. In accord with the principles of *Henry v. State*, 324 Md. 204, 596 A.2d 1024 (1991), the most severe sentence imposed for the crimes of conspiracy should remain. In the case *sub judice*, the most severe penalty was for the conspiracy to commit murder, that is, life imprisonment. The other sentences imposed on the conspiracy counts are vacated.

## IV

In the fourth question, appellants aver that the trial court erred in excluding evidence that implicated Ronald McNeil, the brother of the State's principal witness, Alvin Eugene Thomas, in the offenses for which appellants were tried. Appellants further argue that the trial court erred by excluding statements made by McNeil to a third party, indicating that he was going to "do" [16] named individuals who he believed were responsible for the death of his family members. These statements, appellants argue, implicate persons other than appellants.

---

16. The term "do" means that McNeil was going to murder the individuals.

A hearing was conducted to decide the State's motion *in limine* to suppress the following evidence: 1) McNeil robbed and, using a hammer, murdered his grandfather of Volusia County, Florida in 1983; 2) on October 13, 1990, Collein—a victim and McNeil's mother—called the police to report that McNeil "pulled a handgun on her"; 3) McNeil attacked Jacqueline Russell on February 16, 1993; 4) a few weeks later, on March 29, 1993, McNeil attacked his live-in girlfriend, Jacqueline Ross, with a knife, which resulted in her hospitalization at shock trauma and McNeil's guilty plea to assault with intent to murder; [17] 5) on September 17, 1998, he was charged with choking Tameka McNeil—daughter of McNeil's sister, Mary McNeil Matthews, who is a victim in the instant case and the State's primary witness in the choking case; [18] 6) McNeil kidnapped and assaulted Priscilla Harrison on February 3, 2000 in efforts to lure Gerald Matthews, Jr., to their location for the purpose of killing him in retaliation for Gerald Matthews's killing McNeil's family; 7) statements made by McNeil to a third party identifying several persons other than appellants, namely, "Whitey, Earl, Paul, Black, etc.," who perpetrated the crimes for which appellants were being tried; 8) details surrounding the fact that, when trial commenced, McNeil was incarcerated for the January 25, 2000 murder of Chris Manning in retaliation for the death of his family who were victims of the crimes in the instant case.

The circuit court heard arguments regarding this issue on June 11, 2001. On June 14, 2001, the court made the following findings and rulings:

[H]aving reviewed the authorities I do not believe that the alleged attacks on various people which were recounted by Mr. McNeil are admissible. I think they are insufficiently

---

17. He was sentenced to twelve years' imprisonment—six suspended—and three years probation following his release.

18. He pleaded guilty to assault and was sentenced to nine months. Consequently, a violation of probation occurred as to the assault with intent to murder conviction and he was sentenced to one additional year of incarceration.

similar in conduct to whats [sic] at issue here in the trial. I also think that they [are] inherently unreliable given that it was unlikely to Mr. McNeils [sic] knowledge I believe that the prosecution would result. So accordingly I will not permit the introduction of those—that conduct evidence about Mr. McNeil.

 Generally, Maryland Rule 5–404 [19] applies only as it pertains to criminal *defendants.*

In considering other crimes evidence offered to impeach a witness, the Court of Appeals has held:

We hold that the test for admitting other crimes evidence in criminal proceedings enunciated by *Faulkner* [20] does not apply to crimes, wrongs, or acts committed by anyone other than the defendant. The other crimes evidence rule is a court-created standard designed to ensure that a defendant is tried for the crime for which he or she is on trial and to

---

**19.** (a) **Character evidence generally.** (1) In general. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(A) Character of accused. Evidence of a pertinent trait of character of an accused offered by the accused, or by the prosecution to rebut the same;

(B) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

(C) Character of witness. Evidence of the character of a witness with regard to credibility, as provided in [Md. Rule Evid.] 5–607, 5–608, and 5–609.

(2) Definitions. For purposes of subsections (a)(1)(A) and (B) of this Rule, "accused" means a defendant in a criminal case and a child alleged to be delinquent in an action in juvenile court, and for purposes of subsection (a)(1)(B), "crime" includes a delinquent act as defined by Code, Courts Article, § 3–801.

(b) **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

**20.** *State v. Faulkner,* 314 Md. 630, 552 A.2d 896 (2000).

prevent a conviction based on reputation or propensity to commit crimes, rather than the facts of the present case. Because this rule is premised upon protecting an accused from undue prejudice, it does not apply to exclude acts committed by other people, such as an act committed by a witness who later testifies in the criminal proceedings. *Sessoms v. State,* 357 Md. 274, 281, 744 A.2d 9 (2000).

The Court in *Sessoms* had opined that the standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as a sword. *Id.* at 287, 744 A.2d 9. The Court further observed that the "risks of prejudice are normally absent when the defendant offers similar acts evidence of a third party to prove some fact pertinent to the defense." *Id.* at 288, 744 A.2d 9. In its survey of how other states have handled the issue, the Court of Appeals said:

Several states have made similar interpretations of their other crimes evidence statutes. *[Colorado v.] Flowers,* 644 P.2d [916,] 919 [ (1982) ] ("The test for admissibility of similar offense evidence introduced by the defendant ... must be decided ... *on a case-by-case basis.");* *People v. Bueno,* 626 P.2d 1167, 1170 (Colo.Ct.App.1981) ("When offered by the defendant, evidence of similar transactions is admissible as long as it is relevant to the guilt or innocence of the accused."); *Commonwealth v. Jewett,* 392 Mass. 558, 563, 467 N.E.2d 155, 158 (1984) ("When a defendant offers exculpatory evidence ... prejudice ceases to be a factor, and relevance should function as the admissibility standard."); *[State v.] Garfole,* 76 N.J. [445,] 452–53, 388 A.2d [587,] 591 [ (1978) ] ("When the defendant is offering other crimes evidence exculpatorily, prejudice to the defendant is no longer a factor, and simple relevance to guilt or innocence should suffice as the standard of admissibly, since ordinarily ... an accused is entitled to advance in his [or her] defense any evidence which may rationally tend to refute his [or her] guilt or buttress his [or her] innocence of the charge made."); *State v. Dreher,* 302 N.J.Super. 408, 456–57, 695 A.2d 672, 695 (App.Div.) [ (1997) ] (" 'Other

crimes' evidence about a State's witness is often admitted when offered by criminal defendants for exculpatory reasons."), *cert. denied*, 152 N.J. 10, 702 A.2d 349 (1997); *[State v.] Williams*, 214 N.J.Super. 12], 20, 518 A.2d [234,] 238 [ (1986) ] ("It is well established that a defendant may use similar 'other crimes' evidence defensively if in reason it tends, alone or with other evidence, to negate his guilt of the crime charged against him.").

*Id.* at 290–91, 744 A.2d 9 (emphasis added).

In the case *sub judice*, our task is to determine whether the court correctly ruled that the proferred bad acts of the witness McNeil were "insufficiently similar" to the offense for which appellants were being tried to give credence to the theory that someone else committed the crime. One must approach the analysis on a case-by-case basis. *People v. Bueno*, 626 P.2d 1167, 1170 (Colo.Ct.App.1981).

At the outset, it should be noted that the evidence offered does not in and of itself exculpate appellants. Given the fact that the offenses were committed by multiple defendants, the question is not whether appellants *or* someone else committed the offenses, but rather whether appellants *and* someone else committed the offenses. In other words, the theory posited by appellants of another perpetrator may well be accepted by the trier of fact, yet the evidence is nevertheless sufficient to sustain convictions against them. More to the point, notwithstanding McNeil's documented violent history, the case at hand involves essentially a mass murder consistent with having been carried out by more than one individual. There is no indication that McNeil, throughout his violent past, carried out acts of violence either by himself or in concert with others in the manner that the instant offenses were committed. We are not persuaded that the evidence of McNeil's sordid history is relevant to the proof of criminal agency in this case, particularly, as noted, because the evidence would not tend to exonerate appellants, but rather to establish that McNeil was also involved. The trial court properly decided that the evidence was not relevant and should not be admitted.

## V

 Wilson argues that the trial court erred in denying his motion for severance. He further argues that he was prejudiced because inculpatory statements made by his co-appellants were introduced into evidence at trial but that the statements would have been inadmissible against him individually. The State responds, stating that Wilson's arguments are unavailing because the many references made to the other appellants were redacted. The State additionally argues that, if appellant suffered any prejudice, it was cured by the trial judge's instructions to the jury.

 Maryland Rule 4–253 [21] provides for joint or separate trials. However, whether to join or sever trials is left to the sound discretion of the trial judge. *Frazier v. State,* 318 Md. 597, 607, 569 A.2d 684 (1990) (citing *Grandison v. State,* 305 Md. 685, 705, 506 A.2d 580 (1986); *Graves v. State,* 298 Md. 542, 471 A.2d 701 (1984)).

In *Ogonowski v. State,* 87 Md.App. 173, 186–87, 589 A.2d 513, *cert. denied,* 323 Md. 474, 593 A.2d 1127 (1991), this Court wrote:

> Under Rule 4–253(a), a trial court may conduct a joint trial of two defendants, even if they are charged in separate charging documents "if they are alleged to have participated in the same act or transaction or in the same series of acts

---

**21. Rule 4–253. Joint or separate trials.**

(a) **Joint trial of defendants.** On motion of a party, the court may order a joint trial for two or more defendants charged in separate charging documents if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.

(b) **Joint trial of offenses.** If a defendant has been charged in two or more charging documents, either party may move for a joint trial of the charges. In ruling on the motion, the court may inquire into the ability of either party to proceed at a joint trial.

(c) **Prejudicial joinder.** If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents, or defendants, the court may, on its own initiative or on motion of any party, order separate trials of counts, charging documents, or defendants, or grant any other relief as justice requires.

or transactions constituting an offense or offenses." If, however, one or both defendants "will be prejudiced" by such joinder, the court may require separate trials. Rule 4–253(c). The analysis applicable to joinder and severance of defendants under the foregoing provisions is essentially identical to the analysis applicable to joinder and severance of separate charges against a single defendant under Rule 4–253(b).

The decision to join or sever defendants or charges is a matter within the trial court's discretion. The exercise of that discretion requires balancing the "prejudice" caused by the joinder against "the considerations of economy and efficiency in judicial administration." "Prejudice" within the meaning of Rule 4–253 is a "term of art," and refers only to prejudice resulting to the defendant from the reception of evidence that would have been inadmissible against that defendant had there been no joinder. Under certain circumstances, joinder of defendants or charges results in a presumption of prejudice. *See McKnight v. State,* 280 Md. 604, 611, 375 A.2d 551 (1977) ("other crimes" rule excludes evidence relevant to proof of criminal disposition because such evidence is generally more prejudicial than probative; prejudice will result from joinder whenever this rule is violated). Where the crimes arise out of a single, indivisible series of events, a common scheme or other such circumstances, however, no presumption is applied, and the defendant shoulders the burden of demonstrating prejudice.

(Citations omitted.)

In the case at bar, economy and efficiency in judicial administration was not a factor because Wilson's case could have been joined with the case of his brother, co-defendant Malik, who was tried separately for charges in the instant case.

On June 11, 2001, Wilson's counsel argued that her client would be prejudiced by a joint trial in the following colloquy with the court:

[WILSON'S COUNSEL]: If we go to trial here, all of the evidence regarding Mr. McCoy's written correspondence which was just the subject of [McCoy's counsel's] argument, would be admissible in this case. The [c]ourt would be required to give curative instructions. If he went to trial—

THE COURT: You do not believe that curative instructions would be helpful?

[WILSON'S COUNSEL]: Your honor, I just believe that this [c]ourt has to do a balancing. Before you can balance, there has to be something to balance. The problem we have here is a lot of witnesses who identify my client also identify Mr. Bryant and Mr. McCoy. If I go to trial with Mr. Bryant and Mr. McCoy, then the jury is going to be left thinking okay, all these witnesses identify Bryant, McCoy, Wilson; Bryant and McCoy confessed. Well, if they confessed, then the witnesses might be right.

If they are right about those two, then they must be right about Mr. Wilson. Where if I went to trial with his brother, I would not have any of that problem because none of Mr. McCoy's written documents with Mr. Kromer would be admissible, and nothing about the blurts or statements that Mr. Bryant made while he was on the lam before he was arrested would ever be admitted against my client. The statements and the spillover effect are so prejudicial. Normally what the [c]ourt is required to do is then balance it against the need for judicial economy. But in this case, there is nothing to balance. We are left with highly prejudicial—

THE COURT: Since there is going to be a second trial anyway?

[WILSON'S COUNSEL]: Because the State has got to do a second trial anyway, I am suggesting to the [c]ourt that the fairest way to try this case is to try the two, quote, end quote, "confessing" [appellants] together and then let the two, quote, end quote, "unconfessing" [appellants] go to trial together. Then we avoid the spillover effect. We

avoid the need for cautionary instructions. My fear is a little bit, as [McCoy's counsel] alluded to, we are not talking about Homicide detectives where we can tell them you are instructed to stay away from this area.

. . .

THE COURT: Well, quite apart from the judicial economy argument, as I review the record, I think [the State] is correct in that the overwhelming amount of evidence, given the nature of the transactions at issue here, that evidence would be admissible against all [appellants]. And I do have a faith in curative instructions. Accordingly, Mr. Wilson's motion to sever is denied.

Succinctly put, Wilson's counsel argued that her client would be prejudiced by the jury's consideration of evidence that McCoy and Bryant had confessed and that the possibility of prejudice could be avoided by simply severing Wilson's case from that of his co-defendants. In urging the court to engage in the *McKnight* balancing test, Wilson argued that judicial economy was not a consideration because one of the co-defendants was scheduled to be tried separately in any event and Wilson's case could simply be consolidated with the case already severed. Wilson's counsel had argued that it only made sense that her client, a so-called "non-confessing defendant," should be joined with the other non-confessing defendant, whose trial had already been severed. The trial court dismissed the argument of Wilson's counsel that, because judicial economy was not involved, severance was the preferable course.

Had the trial judge acceded to the request of Wilson's counsel, the interests of all parties clearly would have been served. The trial of the severed co-defendant consolidated with Wilson's trial would not have involved any need to address concerns of non-confessing defendants being prejudiced by the introduction of evidence against co-defendants at a joint trial. Consequently, we are constrained to conclude that the preferable ruling would have been to grant Wilson's motion for severance.

Notwithstanding, because the offenses in the case *sub judice* arise out of a single, indivisible series of events, no presumption of prejudice applies and Wilson, therefore, must shoulder the burden of demonstrating prejudice. We agree with Wilson that considerations of economy and efficiency in judicial administration "fell on neither side of the scales, as the case was scheduled to be tried twice regardless of the ruling on the motion to sever." As a result, our analysis must focus exclusively on the prejudice to Wilson. That prejudice, he avers, resulted from the admission of inculpatory statements made by Bryant and a letter written by McCoy in which he states, "I know I fucked-up [sic] on 5th of Dec. and get [sic] in some shit [sic]." Statements were redacted of references to the non-authoring co-defendants and the trial court instructed the jury on June 27, 2001 as to how the statements could be factored into its deliberations:

> There are three [d]efendants in this case. Although they are all charged with the same offenses, you must consider the evidence as it relates to each [d]efendant separately, and you must consider separately each offense charged against each [d]efendant.
>
> . . .
>
> There are three [d]efendants in this case, as I've told you, and some evidence was admitted only against one [d]efendant and not against any other [d]efendant. The testimony of Detective Bradley, the handwriting exhibits of James Cromer [sic] and Travon McCoy and any stipulation regarding the handwriting exhibits were admitted into evidence only against Travon McCoy and not against any other [d]efendant. The testimony of Julian Austin and Sheriff Earl was admitted into evidence only against Robert Bryant and not against any other [d]efendant. The testimony of Raichelle Dorsey regarding any alleged statement made by Mr. Bryant to her was admitted into evidence only against Mr. Bryant and not against any other [d]efendant. You must consider such evidence only as it relates to the [d]efendant against whom it was admitted. Each [d]efendant is

entitled to have the case decided separately on the evidence that applies to that [d]efendant.

Either under the State's theory that the co-defendants were involved in a conspiracy or, at the very least, were engaged in a concert of action as principals, the evidence would have been admissible against Wilson. Citing *Sye v. State,* 55 Md.App. 356, 362, 468 A.2d 641 (1983), we said in *Eiland v. State,* 92 Md.App. 56, 76, 607 A.2d 42 (1992), *rev'd on other grounds,* 330 Md. 261, 623 A.2d 648 (1993), "The testimony, though damaging to be sure, is competent and, therefore, admissible. Prejudice as a term of art means damage from inadmissible evidence, not damage from admissible evidence." We further observed that the "mere fact that a joint trial may place a defendant in an uncomfortable or difficult tactical situation does not compel a severance."

Thus, because the case at hand involves crimes arising out of a single, indivisible series of events, there is no presumption of prejudice. In order for Wilson to prevail, it is his burden to demonstrate the existence of prejudice which, under *Eiland,* is that the joint trial resulted in *inadmissible* evidence having been offered against him. The record fails to disclose the admission of such inadmissible evidence against Wilson. Finally, great pains were taken to instruct the jury as to the proper use of the inculpatory statements of McCoy and Bryant in the charge to the jury. The denial of the motion for severance did not constitute an abuse of judicial discretion.

## VI

All three appellants contend that the trial court erred by not sustaining their objections to two specific portions of the State's closing argument. The State's closing argument, appellants argue, sought to shift the burden of production of evidence to the defense. In response, the State argues that, because Wilson objected to the first alleged infraction, McCoy to the second, and Bryant to neither, their contentions regarding this issue are not properly preserved. In the alternative,

the State argues that the trial court did not err by allowing the State's closing over appellants' objections.

Closing arguments were heard on June 27, 2001. The first occurrence of which appellants complain is as follows:

> [THE STATE]: Now, you heard from the judge's instructions that the [appellants are] claiming that Alvin Thomas was involved in this somehow, that he was part and parcel of it, that he got together with [appellants] and said, "Hey, let's go over to the house and rob my relatives and kick the door in." That's what they're saying. Did you hear that from any of these witnesses? No. Did you hear that in any of the statements that were made by [appellants] to any of these witnesses? No. Do you see that reflected in any of the writings that came into evidence from Fish [McCoy]? No. Why not? Because we're at trial and [appellants have] to do something.

> [WILSON'S COUNSEL]: Objection.

> THE COURT: Overruled. Jury [sic] understands that this is argument. They [sic] will base their [sic] decision on the evidence. When you say things that [the State] objects to, I will remind [it] of that, as well.

> [THE STATE]: And that's all they could come up with, which ought to tell you something else about the case.

Wilson's counsel addressed the court regarding the State's closing argument.

> [WILSON'S COUNSEL]: Your Honor, as to the first one regarding Mr. McNeil, it does shift the burden to [appellants]. We don't have any obligation to produce anyone. Additionally, Mr. McNeil may or may not have had a Fifth Amendment right, as was argued by the State. The State has the power to grant immunity. [Appellants do] not. We are not on equal footing with the State as far as making Mr. McNeil available.

Appellants contend that the State made the following subsequent inappropriate comments during its rebuttal closing:

[THE STATE]: Ronald McNeil, folks. Here he is. Do you think [appellants] really wanted to hear from Ronald McNeil? This way they get to say, well, you know, all these wonderful nasty things about Mr. McNeil without Mr. McNeil ever being here. So here he is. He's right here.

[Appellants] said we could have called McNeil, we could have called Collins, we could have called Tweaky Milspaw, we could have called Judy Berlin—another week of trial. [Appellant] probably could have called Lisa Miles (phonetic) and Lisa Miles'[s] whole family to put them on at least on Fish's [McCoy] case—

[McCOY'S COUNSEL]: Objection, Your Honor.

THE COURT: Basis?

[McCOY'S COUNSEL]: As we discussed, obviously I have no burden to produce anybody.

THE COURT: Overruled.

■■■■ The court, in a criminal trial, has wide discretion in determining what is allowed during closing arguments and we will not reverse the circuit court absent a clear showing of abuse of discretion and prejudice to the accused. *Degren v. State,* 352 Md. 400, 431, 722 A.2d 887 (1999)("This determination of whether the prosecutor's comments were prejudicial or simply rhetorical flourish lies within the sound discretion of the trial court. On review, an appellate court should not reverse the trial court unless that court clearly abused the exercise of its discretion and prejudiced the accused.") (citations omitted); *Booze v. State,* 111 Md.App. 208, 223–24, 681 A.2d 534 (1996) ("The trial judge has wide discretion with respect to what counsel may say during closing argument and the trial judge's exercise of that discretion will not be disturbed unless clearly abused and prejudicial to the defendant.") (citations omitted); *Clarke v. State,* 97 Md.App. 425, 431–32, 630 A.2d 252 (1993) ("The trial judge has wide discretion with respect to what counsel may say during closing argument, and the trial judge's exercise of that discretion will

not be disturbed unless clearly abused and prejudicial to the defendant.") (citations omitted)).

■■■■ "[C]losing argument is a robust forensic forum wherein its practitioners are afforded a wide range for expression." *Clarke v. State*, 97 Md.App. 425, 431, 630 A.2d 252 (1993) (quoting *Davis v. State*, 93 Md.App. 89, 124, 611 A.2d 1008)). "Generally, counsel are free to discuss the evidence and all reasonable and legitimate inferences that may be drawn from the evidence." *Id.* (citing *Wilhelm v. State*, 272 Md. 404, 326 A.2d 707 (1974)). This range, of course, has bounds. Counsel may not unfairly prejudice the accused or mislead or inflame the jury.

■■■■ Citing *Woodland v. State*, 62 Md.App. 503, 490 A.2d 286 (1985), and *Eley v. State*, 288 Md. 548, 419 A.2d 384 (1980), appellants argue that they were prejudiced because the comments made by the State implicitly shifted the burden of proof although appellants were not obligated to produce any witnesses. In *Woodland*, the State commented that the defendant failed to call a particular *character* witness. The trial judge declined to grant the defendant's request for a curative instruction. Unwilling to apply the missing witness rule,[22] we held that the trial judge erred by not giving the requested

---

**22.** The "missing witness rule," "even in criminal cases is that if a party has it peculiarly within his [or her] power to produce witnesses whose testimony would eludicate [sic] the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 [(1893)].

. . .

Thus, the missing witness rule applies where (1) there is a witness, (2) who is peculiarly available to one side and not the other, (3) whose testimony is important and non-cumulative and will elucidate the transaction, and (4) who is not called to testify. The inference to be drawn from the failure to call a witness will arise only if the relationship between the defendant and the witness is one of interest or affection. The inference will not arise if the relationship is that of accomplice/defendant, although the defendant's conviction will not be set aside if the prosecution argues the rule and no request for a reverse missing witness instruction is made.

*Woodland*, 62 Md.App. at 510–11, 490 A.2d 286.

curative instruction because the character of the accused is significant and may impact heavily upon the jury's ultimate verdict. *Woodland* is easily distinguished from the case *sub judice.*

The issue in *Eley* was whether the circuit court correctly refused to allow the defendant to comment upon the State's lack of evidence during closing argument. Specifically, defense counsel sought to edify the significance of the fact that the State was unable to produce fingerprint evidence from an automobile, which was allegedly the vehicle used to flee the crime. The Court of Appeals held that, "where there is *unexplained* silence concerning a routine and reliable method of identification especially in a case where the identification testimony is at least subject to some question, it is within the scope of permissible argument to comment on this gap in the proof offered." *Eley,* 288 Md. at 555, 419 A.2d 384. Therefore, the Court explained, "the limitation placed by the trial court on defense counsel's scope of argument constituted prejudicial error and an abuse of discretion." *Id.* at 556, 419 A.2d 384. *Eley* is also distinguishable from the instant case.

The trial judge did not abuse his discretion. The case was not a close one and the evidence weighed heavily in the State's favor. The issue regarding whether or not McNeil would testify or the weight of his testimony in exculpating appellants was not central to the case. Finally, the trial court took reasonable steps on the record to mitigate any potential error. The second comment made by the State was merely in response to appellants' closing argument. *See Degren v. State,* 352 Md. 400, 433, 722 A.2d 887 (1999); *Booze v. State,* 111 Md.App. 208, 224, 681 A.2d 534 (1996). For these reasons, we hold that the State's closing argument did not shift the burden of persuasion to appellants.

## VII

Appellants Wilson and Bryant next challenge the refusal of the trial court to propound appellants' requested

*voir dire* questions to the jury. The four questions at issue are as follows:

10. Has any member of this jury panel served on a jury trial when, after the verdict was rendered, the judge or the attorneys for either side made a comment to you about the case or the parties involved? Would this or any other experience you have had as a juror on a case(s) affect your ability to sit as a juror on this case?

11. Would the fact that the Police Commissioner, Mayor O'Malley and others criticized a recent jury for its decision to find a[d]efendant not guilty make you reluctant to acquit because of potential criticism?

15. The [d]efendant in every criminal case is presumed innocent. Unless you are satisfied beyond a reasonable doubt of the [d]efendant's guilt solely from the evidence presented in this case, the presumption of innocence alone requires you to find the [d]efendant not guilty. Is there any member of the jury panel who is unable or unwilling to uphold and abide by this rule of law?

22. Each [d]efendant is entitled to have his guilt or innocence determined as to each charge from the evidence which applies to him alone. The guilt or innocence of one defendant cannot control or influence your finding of guilt or innocence as to the other [d]efendants.

 Would you be able to decide the guilt or innocence of each [d]efendant on each count based solely on the evidence presented as to the individual [d]efendant and not let your decision be influenced by the evidence as to the other [d]efendants?

The following colloquy took place at trial:

THE COURT: Go Back to your seat, thank you.

 Okay, State, are there objections to the *voir dire* questions?

[WILSON'S COUNSEL]: May I step back a moment?

THE COURT: .Yes

[THE STATE]: No.

THE COURT: [Bryant's counsel], are there any objections to the *voir dire* questions?

[BRYANT'S COUNSEL]: I have no objections.

THE COURT: [McCoy's counsel], are there any objections to the *voir dire* questions?

[McCOY'S COUNSEL]: No objections and no requests.

THE COURT: Very good. What I am going to do is thin out as many as we can today. Yes, ma'am?

[WILSON'S COUNSEL]: Yes, Your Honor, I except to the [c]ourt's refusal to ask question no.—

THE COURT: Let me get your—

[WILSON'S COUNSEL]: I am sorry.

THE COURT:—questions in front of me. Yes, ma'am, okay?

[WILSON'S COUNSEL]: Question no. 10 and question no. 11.

THE COURT: Hold on for a moment. Question no. 10.

[WILSON'S COUNSEL]: They are both related.

THE COURT: Okay.

[WILSON'S COUNSEL]: I have had several jury trials in this courthouse where after the juries have acquitted, the judges have read my clients' criminal records to them implying that it was the wrong verdict. I have had jurors approach me in tears and say do we really acquit a guilty person after Judge Ward did that? And I also have great concerns because of the Police Commissioners, Martin O'Malley and Sheila Dixon, taking to the air waves criticizing our jurors any time they return an acquittal. And I think it makes the jurors sensitive, and I think it is a necessary question.

THE COURT: Okay, next?

[WILSON'S COUNSEL]: I also except to the [c]ourt's refusal to ask, especially in this case, in light of the answers we have been getting from the panel, whether or not people believe in the presumption of innocence. I

think it is something, unfortunately, that has been lost over time. And I also except to the [c]ourt's failure to ask any questions about the fact that even though these gentlem[e]n·are being tried together, that the evidence has to be considered against each of them singly.

THE COURT: It is a matter of instruction.

[WILSON'S COUNSEL]: Right.

THE COURT: The [c]ourt will so instruct them. Next.[23]

Trial judges have broad discretion in determining whether requested *voir dire* questions should be propounded to the prospective jury. *State v. Thomas*, 369 Md. 202, 798 A.2d 566 (2002); *Perry v. State*, 344 Md. 204, 686 A.2d 274 (1996); *Hill v. State*, 339 Md. 275, 661 A.2d 1164 (1995). The purpose of the *voir dire* process is to determine the prospective jurors' state of mind, and further, to ascertain whether the venire harbors any bias, prejudice, or preconception regarding the accused, a central matter in the case such as the crime, or any relevant collateral matter. *Thomas*, 369 Md. at 207–208, 211, 798 A.2d 566 (citing *Davis v. State*, 333 Md. 27, 633 A.2d 867 (1993)). In so doing, the judicial process is protected by ensuring that the accused is tried by a fair and impartial jury. *Id.* at 207, 798 A.2d 566 (citing *Boyd v. State*, 341 Md. 431, 435, 671 A.2d 33 (1996); *Hill v. State*, 339 Md. 275, 279, 661 A.2d 1164 (1995); *Davis v. State*, 333 Md. 27, 34, 633 A.2d 867 (1993); *Bedford v. State*, 317 Md. 659, 670, 566 A.2d 111 (1989); *Casey v. Roman Catholic Archbishop*, 217 Md. 595, 605, 143 A.2d 627 (1958); *Adams v. State*, 200 Md. 133, 140, 88 A.2d 556 (1952)); *see also Dingle v. State*, 361 Md. 1, 759 A.2d 819 (2000).

Central to our analysis is whether the requested *voir dire* questions presented by appellants would have disclosed relevant reason(s) for a prospective juror to be disqualified. *Thomas*, 369 Md. at 206, 798 A.2d 566.

---

**23.** The record indicates that Wilson's counsel reiterated her concerns at trial the following day.

*Voir dire,* the process by which prospective jurors are examined to determine whether cause for disqualification exists, *see Boyd v. State,* 341 Md. 431, 435, 671 A.2d 33, 35 (1996), is the mechanism whereby the right to a fair and impartial jury, guaranteed by Art. 21 of the Maryland Declaration of Rights, n7 *see Grogg v. State,* 231 Md. 530, 532, 191 A.2d 435, 436 (1963), is given substance. *See Hill v. State,* 339 Md. 275, 280, 661 A.2d 1164, 1166 (1995); *Bedford v. State,* 317 Md. 659, 670, 566 A.2d 111, 116 (1989). The overarching purpose of *voir dire* in a criminal case is to ensure a fair and impartial jury. *See Boyd,* 341 Md. 431, 435, 671 A.2d 33, 35 (1996); *Hill,* 339 Md. 275, 279, 661 A.2d 1164, 1166 (1995); *Davis v. State,* 333 Md. 27, 34, 633 A.2d 867, 871 (1993); *Bedford,* 317 Md. 659, 670, 566 A.2d 111, 117 (1989); *Casey v. Roman Catholic Archbishop,* 217 Md. 595, 605, 143 A.2d 627, 631 (1958); *Adams v. State,* 200 Md. 133, 140, 88 A.2d 556, 559 (1952). In *Davis,* 333 Md. at 33, 633 A.2d at 871, *quoting Langley v. State,* 281 Md. 337, 340, 378 A.2d 1338, 1339 (1977) (citing *Waters v. State,* 51 Md. 430, 436 (1879)), we said, "a fundamental tenet underlying the practice of trial by jury is that each juror, as far as possible, be impartial and unbiased."

*Dingle,* 361 Md. at 9, 759 A.2d 819.

We hold that the *voir dire* questions in the case at bar were not framed in a manner likely to expose biases, prejudices, or misconceptions of the jury panel.

[V]*oir dire,* whether in a capital case or in the more usual situation, to be meaningful, must uncover more than "the jurors" [sic] bottom line conclusions to broad questions, which do not in themselves reveal automatically disqualifying biases as to their ability fairly and accurately to decide the case, and, indeed, which do not elucidate the bases for those conclusions.

*Id.* at 15, 759 A.2d 819 (citing *Bowie v. State,* 324 Md. 1, 23, 595 A.2d 448 (1991)). Moreover, "[q]uestions not directed to a specific ground for disqualification but which are speculative, inquisitorial, catechising or 'fishing', asked in the aid of decid-

ing on peremptory challenges, may be refused in the discretion of the court, even though it would not have been error to have asked them." *Id.* at 14, 595 A.2d 448 (quoting *Davis,* 333 Md. at 34–35, 633 A.2d 867, in turn quoting *McGee v. State,* 219 Md. 53, 58–59, 146 A.2d 194 (1959)).

In the case *sub judice,* questions number 10 and 11 fail to disclose the prospective jurors' potential biases, prejudices, or preconceptions regarding appellants, the crimes for which they were being tried, or any other relevant collateral matter. Questions number 15 and 22 more closely resemble jury instructions rather than *voir dire* questions. "It is generally recognized that it is inappropriate to instruct on the law at this stage of the case, or to question the jury as to whether or not they would be disposed to follow or apply stated rules of law." *Twining v. State,* 234 Md. 97, 100, 198 A.2d 291 (1964), *quoted in Davis v. State,* 93 Md.App. 89, 112, 611 A.2d 1008 (1992)("It is our view that the question which appellant sought to have propounded to the jury did not relate to a cause for disqualification under the circumstances."); *Carter v. State,* 66 Md.App. 567, 577, 505 A.2d 545 (1986)("The Court of Appeals held that the lower court had not abused its discretion in refusing the question for *voir dire,* recognizing and following the generally accepted rule 'that i[t] is inappropriate to instruct on the law at the *voir dire* stage of the case, or to question the jury as to whether or not they would be disposed to follow or apply stated rules of law.").

The questions at issue do not achieve the purpose for which the *voir dire* process was designed. In fact, the latter two questions closely resemble jury instructions. The trial judge did not abuse his discretion by declining to propound appellants' requested *voir dire* questions.

## VIII

■ Bryant contends that the trial court erred by not giving his "requested jury instruction explaining that a person who helps the perpetrators of a crime only after the crime is committed is not guilty of aiding and abetting." At trial,

Bryant's defense included the legal theory that he was an accessory after the fact and not a participant in the crimes for which he was charged. In response, the State argues that Bryant's contention is "unsupported by any legal authority." In the alternative, the State argues that, if the court erred by denying Bryant's requested instruction, the error was harmless beyond a reasonable doubt.

Maryland Rule 4–325(c) provides:

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. *The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.*

Md. Rule 4–325(c) (emphasis added). Accordingly, a trial judge is only required to give a requested instruction *"if the matter is [not] fairly covered by instructions actually given." Id.* (emphasis added); *see also General v. State,* 367 Md. 475, 485, 789 A.2d 102 (2002)(explaining that "the main purpose of jury instructions is to aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict")(citing *Chambers v. State,* 337 Md. 44, 650 A.2d 727 (1994)).

Appellant concedes that he was not entitled to a separate instruction on accessory after the fact. Yet, he requested the trial judge to differentiate between what constitutes being an accomplice and what constitutes being an accessory after the fact. Moreover, the record indicates that appellant was not charged with accessory after the fact. The trial judge was not constrained to modify the instruction as requested because the matter was "fairly covered by instructions actually given." Furthermore, appellant does not contend that the instruction given by the trial judge was inadequate as it pertains to the charge of aiding and abetting. Accordingly, we hold that the trial judge did not err in declining to incorporate appellant's

requested addendum to the instruction actually given to the jury.

## IX

 Bryant argues that "the trial court erred in refusing to grant a mistrial after implicitly endorsing the testimony of a critical State's witness that, if believed, was determinative of Mr. Bryant's guilt." Bryant further argues that the actions of the trial court interfered with the jury's fact-finding role and, therefore, the trial judge abused his discretion by denying appellant's motion for a mistrial. In response, the State argues that Bryant has taken the court's comments out of context.

At trial, on June 25, 2001, the following colloquy took place regarding the direct and cross-examination of witness Julian Austin:

THE COURT: [Wilson's counsel], will you be crossing?

[WILSON'S COUNSEL]: No, sir.

THE COURT: [Bryant's counsel], will you be crossing[?]

[BRYANT'S COUNSEL]: I will.

THE COURT: How long will you be?

[BRYANT'S COUNSEL]: Approximately 30 to 45 minutes.

THE COURT: On this witness?

[BRYANT'S COUNSEL]: Judge, he is talking about [R]ob Bryant.

THE COURT: Okay. [McCoy's counsel]?

[McCOY'S COUNSEL]: No cross.

. . .

THE COURT: [Bryant's counsel], you have a motion?

[BRYANT'S COUNSEL]: Yes, [Y]our [H]onor. Your [H]onor, I'm going to move for a mistrial.

THE COURT: Okay.

[BRYANT'S COUNSEL]: The basis for the mistrial is that at approximately 12:25 when we were ready to break for lunch, the court inquired after Mr. Austin had testified as

to the cross-examination of [Wilson's counsel, McCoy's counsel] and [I]—

THE COURT: For the record, Mr. Austin had testified for [sixteen] minutes, yes.

[BRYANT'S COUNSEL]: Just so the record—

THE COURT: The request was made that your cross would take two to three times longer than he'd taken on direct. Yes, [I] did.

[BRYANT'S COUNSEL]: Here is my concern, judge and here is the basis for the motion.

THE COURT: Quickly. You're wasting my time. Spit it out.

[BRYANT'S COUNSEL]: Mr. Austin testified to an unequivocal admission by my client of having killed five people.

THE COURT: Um—um.

[BRYANT'S COUNSEL]: He also testified that my client stated that the basis—

THE COURT: Is the witness here?

[BRYANT'S COUNSEL]: It doesn't matter. The basis or the reason for going in that house was to do a robbery or to get money. The court's comments in light of that— assuming if the jury were to believe that—then, Mr. Bryant and [I] should probably, at this point, should just sit down and remain mute. The court's comment was [thirty] minutes—

THE COURT: Your actual estimate was [thirty] to [forty-five] minutes.

[BRYANT'S COUNSEL]: My actual estimate was [thirty] minutes, maybe as long as [forty-five] minutes.

THE COURT: The court did not make any comment about the reasonableness or the unreasonableness of it.

[BRYANT'S COUNSEL]: Well, judge, my point, if I can be heard—

THE COURT: Your point should be made accurately. There was no comment by the court on the length of time

other than to repeat the time estimate. Don't put a lie on the record, [Bryant's counsel].

[BRYANT'S COUNSEL]: I'm not putting a lie on the record.

THE COURT: You're trying to. You're trying to say [I] made some sort of comment about your projected time and [I] did not.

[BRYANT'S COUNSEL]: Judge, you expressed dismay, as you just said, that [I] might take—

THE COURT: What was that expression of dismay?

[BRYANT'S COUNSEL]: You said to me, "this witness"—

THE COURT: Yes?

. . .

[BRYANT'S COUNSEL]: Judge, [I] think what that conveyed to the jury one, there could not be anything reasonable that [I] could spend [thirty] minutes up to [forty-five] minutes on.

THE COURT: I happen to believe that's true. But go ahead.

[BRYANT'S COUNSEL]: And [I] believe that if, the only way the jury can interpret that, is either the jury disbelieves Mr. Austin or it believes Mr. Austin and you, [Bryant's counsel], are wasting this jury's time by asking questions of this witness.

I think the court clearly communicated to this jury that, number one—

THE COURT: Is that through hand signals or something? You said clearly communicated.

[BRYANT'S COUNSEL]: I believe the court did. I think the jury—

THE COURT: You have just given me two conflicting interpretations of what I said. Yet, you said it was clearly communicated. You said it was either disbelieve or believe which seems conflicting. Something that you view as being internally consistent, but yet you believe it

was a clear communication. That seems fatuous and silly on it's [sic] face, [Bryant's counsel].

[BRYANT'S COUNSEL]: Judge, what I'm suggesting to you is the jury could have concluded only one of two things: Either you believed him, which [I] think would be preposterous to suggest, because [I] don't think any juror is going to conclude that what you intended to communicate was that you believed him.

THE COURT: Are you getting near to being done, [Bryant's counsel]?

[BRYANT'S COUNSEL]: Well, [I] think [I]'m pretty much done. I think what the court communicated to this jury, and [I] say relatively clearly, relatively unequivocally was that there was little or no use for Mr. Bryant and counsel to cross-examine this witness. Therefore, the jury ought to believe it and if the jury believes it, your client can be nothing but guilty.

THE COURT: I thought you said there were two conflicting interpretations the jury could have from the comment?

[BRYANT'S COUNSEL]: It is, judge, but the one is preposterous. And that is that you disbelieve the witness. I said that three times now. I suggest that the interpretation that would have benefitted Mr. Bryant, the court made very clear that that is not how it was interpreting the testimony, therefore, why am [I] wasting everybody's time including the jury's? I think the comment should not have been made. I now have to cross-examine after the court has suggested to the jury that I'm wasting the jury's time. For that reason, [I] move for a mistrial.

THE COURT: Does the [S]tate join in the motion for mistrial?

[THE STATE]: No, [Y]our [H]onor.

THE COURT: Okay.

[BRYANT'S COUNSEL]: In the alternative, [I] ask that the court give an instruction to the jury.

THE COURT: What shall it say?

[BRYANT'S COUNSEL]: Advising the jury that the court's comments should in no way be construed to mean that you are taking a position one way or the other with regard—

THE COURT: I do that as part of my general instructions.

Anything else, [Bryant's counsel].

[BRYANT'S COUNSEL]: No, [Y]our [H]onor.

 Regarding the benchmark in the grant or denial of a motion for mistrial, we have held:

> Whether to declare a mistrial or not is a matter which is committed to the sound discretion of the trial court. Ordinarily, the exercise of that discretion will not be disturbed upon appeal absent a showing of prejudice to the accused. In order to warrant a mistrial, the prejudice to the accused must be real and substantial; a mistrial should never be declared for light or transitory reasons.

*Chambers v. State,* 81 Md.App. 210, 217, 567 A.2d 458 (1989) (citations omitted); *accord Carter v. State,* 366 Md. 574, 785 A.2d 348 (2001); *Klauenberg v. State,* 355 Md. 528, 735 A.2d 1061 (1999); *Rainville v. State,* 328 Md. 398, 614 A.2d 949 (1992); *Hunt v. State,* 321 Md. 387, 583 A.2d 218 (1990). The trial judge is in the best position to decide whether the motion for a mistrial should be granted. Accordingly, we will not interfere with the trial judge's decision unless appellant can show that there has been real and substantial prejudice to his case. *See Carter,* 366 Md. at 589, 785 A.2d 348 (citing *Rainville v. State,* 328 Md. 398, 408, 614 A.2d 949 (1992)).

 In determining whether appellant was prejudiced, necessitating a mistrial, we consider the following five factors:

> [W]hether the reference . . . was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the [person] making the reference is the principal witness upon whom the entire prosecution

depends; whether credibility is a crucial issue; and whether a great deal of other evidence exists.

*Carter,* 366 Md. at 590, 785 A.2d 348 (citation omitted).

In the case at hand, one alleged inappropriate comment was made by the trial judge and it was not repeated. The statement was not solicited by counsel. Although the statement was made by the trial judge in reference to a witness, the case did not depend entirely upon the witness. The credibility of the witness, as instructed by the court, was for the jury to decide and comments or views of the court were not to be considered as evidence in the case. There was a considerable amount of other evidence. Our review of the record persuades us that there was no demonstrable prejudice to appellant and the trial judge did not err by denying Bryant's motion for a mistrial.

## X

McCoy avers that "the trial court erred in admitting letters written by a non-testifying jail inmate that contained hearsay which implicated appellant." He was assigned to a cell when he was arrested on September 13, 2000 adjacent to James Kromer in the Baltimore City Detention Center. The correspondence that McCoy claims should not have been admitted is as follows:

[KROMER]: Fish [McCoy], you said you are trying to get out [sic] Thomas'[s] location from your lawyer or the investigator and your brother has been squatting on [T]homas'[s] girlfriend's house. If that happened, who will take out Thomas? How would you handle that? Plus, you are right, you do have to keep Lisa tight. She is too important to your case.

[McCOY]: I'm trying to find out where [T]homas is staying at [sic] now because my people already want to find out where he is so that could happen, feel me? [sic] Lisa is tight.[sic] She isn't going nowhere [sic]. If I try to let her go, she's just waiting for that day.

[KROMER]: The lady next door, she didn't see you? Then you won't have anything to worry about there. What was her name?

[McCOY]: Brenda K. Cleveland, 1229 Gusryan [S]treet.

[KROMER]: Fish [McCoy], how could Thomas state that you killed or shot his mother if he was outside in the car when the shots were fired? What happened before he was taken out? Was the mother shot before? I mean, like in his presence? How could he be held under control?

[McCOY]: Thomas was at the house before the killing started. Thomas was take[n] outside and the five females and McNeal [sic] was [sic] taken downstairs and all was [sic] killed. After that, the mother crawled upstairs. That [sic] why [I] don't know how Thomas know [sic] who killed his mother, that [sic] bullshit [sic].

In response to McCoy's objection to the admission of the correspondence on the basis that it contained incriminating "assertions being made by Kromer," the court stated on June 11, 2001:

Okay ... I think your argument would be a bit stronger if there were something in the responses that refute it. But what you have got [sic] actually is something that seems to assume or concede the truth of whatever assertions are made in the question, and then adds additional detail. I do not think that is hearsay.

. . .

... these are questions and the assertions come from your client essentially adopting what is in the questions and then adding additional detail to them. It does not look like hearsay to me.

Citing *Carlton v. State,* 111 Md.App. 436, 443, 681 A.2d 1181 (1996), and *Gregory v. State,* 40 Md.App. 297, 391 A.2d 437 (1978), McCoy claims that Kromer's questions constitute assertions of fact made out of court which could only properly come from the mouth of appellant.

The State contends that the correspondence constitutes "tacit admissions" by a party opponent recognized as an exception to the hearsay rule under common law (citing *Key–El v. State*, 349 Md. 811, 816, 709 A.2d 1305, *cert. denied*, 525 U.S. 917, 119 S.Ct. 267, 142 L.Ed.2d 220 (1998)).

In *Henry v. State*, 324 Md. 204, 241, 596 A.2d 1024 (1991), the Court of Appeals explained:

> [A]n admission may be implied through the affirmative conduct or, in the case of "tacit admissions," the silence or inaction of a party. A tacit admission occurs when one remains silent in the face of accusations that, if untrue, would naturally rouse the accused to speak in his or her defense.

(Citations omitted.)

The Court in *Henry* cited Professor Lynn McClain's treatise on evidence which identifies the prerequisites to classify a statement as a tacit admission:

> A party may make a "tacit admission," adopting, by his or her silence, another person's statement. In order for the other's statement to be considered the party's tacit admission, the following prerequisites must be satisfied: (1) the party heard and understood the other person's statement; (2) at the time, the party had an opportunity to respond; (3) under the circumstances, a reasonable person in the party's position, who disagreed with the statement, would have voiced that disagreement. The party must have had first-hand knowledge of the matter addressed in the statement.

*Henry*, 324 Md. at 241–42, 596 A.2d 1024 (citing 6 L. McLain, *Maryland Evidence* § 801(4).3 at 312–13 (1987) (footnotes omitted)).

Unquestionably, McCoy heard and understood the questions and assertions made by Kromer as evidenced by the fact that he responded to them. Had the questions and assertions been untrue, it was incumbent for McCoy to disclaim them and offer a true version of the matters asserted. His actions in the instant case go beyond mere passive silence, but rather constitute acquiescence in an adoption of the statements. The

court's determination that the correspondence was therefore an admission was correct.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AS TO CONSPIRACY TO COMMIT ROBBERY AND CONSPIRACY TO COMMIT KIDNAPPING VACATED AS TO EACH APPELLANT; JUDGMENT OF THE CIRCUIT COURT FOR ALL REMAINING CONVICTIONS AFFIRMED AS TO EACH APPELLANT.**

**COSTS TO BE PAID 9/10 BY APPELLANTS AND 1/10 BY MAYOR AND CITY COUNCIL OF BALTIMORE.**